PRUDENCE COAL CO. v. PERKINS.

(Circuit Court of Appeals, Fourth Circuit. September 8, 1914.)

No. 1,250.

1. MINES AND MINERALS (§ 70*)—CONSTRUCTION OF COAL LEASE—PRACTICAL CONSTRUCTION BY PARTIES.

Where a lessee of coal lands paid royalties for ten years, three of which were after the death of the lessor, on a certain construction of the terms of the lease, which were somewhat ambiguous, it will be taken as the true construction as against the lessee.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 192–197; Dec. Dig. § 70.*]

2. MINES AND MINERALS (§ 70*)—ACTION FOR ROYALTIES UNDER DEED OF LEASE—PLEADING.

A lessor of coal lands may recover royalties due under the lease on coal previously mined and sold by the lessee under the common counts in assumpsit in West Virginia, where by statute assumpsit may be maintained on a sealed contract.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 192–197; Dec. Dig. § 70.*]

In Error to the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action at law by Annette S. Perkins against the Prudence Coal Company. Judgment for plaintiff, and defendant brings error. Affirmed.

W. G. Mathews, Malcolm Jackson, Mollohan, McClintic & Mathews, and Brown, Jackson & Knight, all of Charleston, W. Va., for plaintiff in error.

Geo. E. Price, of Charleston, W. Va., for defendant in error.

Before PRITCHARD and KNAPP, Circuit Judges, and McDOWELL, District Judge.

McDOWELL, District Judge. This is an action of assumpsit instituted August 30, 1912, by the defendant in error, the legatee of J. A. McGuffin, who will be hereafter referred to as the plaintiff, against the plaintiff in error, a corporation, which will be hereafter called the defendant. The declaration contains only the common counts. With it was filed a bill of particulars, which fully details the nature and items of plaintiff's claim. The defendant pleaded non assumpsit and offsets, and filed with the latter an account of offsets. The case was tried before a jury, and resulted in a directed verdict and judgment for the plaintiff.

On May 1, 1900, Mrs. Sarah Lyman and her husband made to J. A. McGuffin a coal mining lease of a tract of 138 acres. The lease was to run until all the workable and merchantable coal should have been mined from the leased tract and from other tracts operated in connection therewith, but not to exceed 30 years. The royalty agreed upon was 6 cents per ton of 2,240 pounds of coal mined from the leased premises. The following is the stipulation as to minimum:

"If the said royalty in any year or years after the period of one year from the date of this lease, and before all the coal is mined from said land as hereinafter provided, shall not under the provisions above set out amount to the sum of five hundred dollars ($500.00), then the lessee shall pay said sum of five hundred dollars ($500.00) to the said Sarah E. Lyman, her heirs and assigns, as a minimum rental for that year, but the excess of said five hundred dollars ($500.00) so paid over the amount of coal mined in that year at six (6) cents per ton of two thousand two hundred and forty (2,240) pounds, shall be credited on the excess of royalty over and above the five hundred ($500.00) dollars in the next succeeding year, provided the same is done within one (1) year from the end of the year in which the said sum of five hundred dollars ($500.00) rental becomes due and payable."

In this lease McGuffin was given the right to assign the lease to a corporation already chartered or to be chartered, and it is provided that the coal on the leased premises is to be mined "in connection with mines upon lands leased from Morris Harvey or any other person or persons." Under this lease the royalties are payable in quarterly installments on the 1st days of January, April, July, and October of each year.

On April 18, 1900, the said McGuffin secured another coal lease from C. T. Jones and others, for a term of 40 years, at a royalty of 5½ cents per ton of 2,240 pounds. The agreement as to minimum here follows:

"If the said royalty in any year or years after the year 1902, and during the term of this lease, shall not under the provisions above set out amount to the sum of four thousand dollars, then the lessee shall pay said amount of $4,000 as a minimum royalty for that year, but the excess of said $4,000 so paid over the amount of coal mined in that year at five and one-half cents per ton of 2,240 pounds, shall be credited on the excess of royalty over and above the four thousand dollars in the next succeeding year, provided the same is done within two years from the end of the year in which the said sum of $4,000 royalty becomes due and payable."

The royalty payments became due in quarterly installments on the same days as under the Lyman lease.

On November 28, 1900, McGuffin secured another coal lease from Morris Harvey. The royalty was 6 cents per ton of 2,240 pounds, payable quarterly, commencing April 1, 1902. No minimum is required.

On December 19, 1900, H. E. Firmstone and J. E. Johnson made a lease to McGuffin, which, as subsequently modified, provided for a royalty of 6 cents per long ton, payable quarterly on the same days as under the foregoing leases. The modified provision as to minimum royalty is as follows:

"If the said royalty, in any year or years, after the year 1902, and during the term of this lease, shall not, under the provisions above set out, amount to the sum of $2,000, then the lessee shall pay said amount of $2,000 as a minimum royalty for that year. But, should the actual royalty at 6 cents per ton, of 2,240 pounds, and 75 cents per 1,000 tons, as above provided, not equal the said sum of $2,000 in any year, the said lessee shall have the right to reimburse itself, without interest, by mining sufficient coal at the rate of royalty aforesaid, in excess of $2,000 per annum, at any time and in any year or years during the term of this lease."

This lease also provides for assignment to a corporation already chartered or to be chartered, and provides that the mining on the leased premises is to be carried on in connection with the mining of the Harvey land, the Jones land, and other lands.

On January 1, 1901, McGuffin executed a contract under seal to the Prudence Coal Company. After a recital that McGuffin owns leases from C. T. Jones et al., Mrs. Lyman, Morris Harvey, and from Firmstone and Johnson, this document, inter alia, provides:

"That the said party of the second part shall assume, observe, perform, and comply with each and all the obligations, covenants, provisions, and conditions contained in said several leases which the said party of the first part is obliged thereby to observe, perform, and comply with, and especially shall pay to the said several lessors therein named, or their assigns, the rents and royalties and all sums of money therein required to be paid to them by said party of the first part, and shall protect and save harmless the said party of the first part, from all claims of the said lessors or their assigns for said rents, royalties, and sums of money.

"That the said party of the second part, in addition to the rents and royalties to be paid by it to the said lessors as hereinbefore provided, shall pay to the said J. S. McGuffin, party of the first part, his personal representatives or assigns, such further rent or royalty as, with the rent and royalty provided for in said respective leases, will make ten cents rent or royalty for each and every ton of coal mined or dug by it from said respective leasehold properties upon which royalty is to be paid under said leases. The said additional rent or royalty to be paid to the said party of the first part by the said party of the second part at the same time or times that the original rents or royalties mentioned in said leases are payable, respectively, to the several lessors

therein named. And the tonnage upon which such additional rents or royalties are to be paid to the said party of the first part, so as to make up said 10 cents per ton, shall be determined in the same manner as the tonnage is determined for the rents and royalties to be paid to the said lessors; it being the intention of the parties hereto that the said party of the second part shall pay altogether the royalty of 10 cents per ton for all the coal mined from said leasehold premises upon which royalty is payable under said leases, and that it shall pay to the several lessors the rents and royalties provided for in their several leases, respectively, and then pay to the said J. A. McGuffin, party of the first part, his personal representatives or assigns, the balance of said 10 cents over and above what is paid to the said lessors.

"The said party of the second part shall stand in all other respects in the place of the said party of the first part under the said several leases hereinbefore transferred and assigned to it.

"And in consideration of the premises and the assignment to it of the leases and leasehold estates aforesaid, the said Prudence Coal Company, party of the second part, hereby covenants and agrees with the said party of the first part that it will observe, perform, and comply with all the obligations, covenants, stipulations, and conditions contained in the several leases hereinbefore assigned to it, and that it will pay to the several lessors therein named all the rents, royalties, and sums of money therein provided to be paid by the said J. A. McGuffin, and will protect and save the said McGuffin harmless from all claims on the part of said lessors for such rents, royalties, and sums of money, and that it will pay to the said party of the first part, his personal representatives or assigns, the additional rents and royalties provided for in said several leases, so as to make the rent or royalty of 10 cents per ton upon each and every ton of coal mined and upon which royalty is payable under said leases, as hereinbefore fully set forth."

## The following were agreed facts:

"First. That prior to the execution of the lease from H. Firmstone and J. E. Johnson and wife to J. A. McGuffin, and prior to the assignment thereof, along with other leases, by the said McGuffin to the Prudence Coal Company by the deed of January 1, 1901, said Firmstone and Johnson had been long and close business associates in other coal properties with the said McGuffin, and personal friends, and that prior to the execution of both said lease and said assignment it was agreed and understood between said Firmstone and Johnson, on the one hand, and said McGuffin, on the other hand, that if said lease was made to said McGuffin that it, together with the other leases taken by said McGuffin, were to be assigned by him to a corporation to be formed, and that said Firmstone and Johnson were to purchase, take and own a controlling stock interest in said corporation, to wit, 60 per cent. of said stock, and said McGuffin and other associates the residue, to wit, 40 per cent., and that the entire management and full control of said properties was to be given the said McGuffin, who was to be elected president of said corporation, and that this agreement constituted one of the considerations of said lease from Firmstone and Johnson to said McGuffin, and was subsequently fully carried out by the assignment of said leases to the Prudence Coal Company, the purchase of stock therein, the election of said McGuffin as president, and the adoption of resolutions vesting him with full control and management of said properties for said corporation, and the assumption and discharge by him of such duties, until he sold his stock in said company on the 1st day of May, 1906.

"Second. That said lands so leased by said Firmstone and Johnson were essential to the economical mining of the other lands leased by said McGuffin and assigned to said company, and lay between said other lands and the Chesapeake & Ohio Railway and Kanawha river.

"Third. That for the year 1902 all of the rents and royalties due under said leases were paid by the defendant by check to said McGuffin, who was left to settle with his lessors, and thereafter until said McGuffin sold his stock and retired as president, on the 1st day of May, 1906, he caused himself to be paid by said company under his management a royalty of 4 cents per ton on each ton of coal actually mined and dug from the Lyman lease, the Firmstone

and Johnson lease, and the Harvey lease, and 4½ cents per ton for the Jones lease, without regard to the minimum royalty exceeding, equaling, or being less than the actual tonnage royalty due in each year under said leases, respectively, to the lessors therein which minimum royalty was paid said lessors during each year, *and that after the death of said John A. McGuffin until the third quarter of 1911 said like royalty was paid to the estate of John A. McGuffin, and that after said sale of stock by said McGuffin and until his death like royalties were paid him by said company.*

"Fourth. That the minute books of said company do not show that the propriety and amounts of royalties payable to said McGuffin, or his assigns, under said assignment of January 1, 1901, was brought before the stockholders or directors, or was at any time the subject of corporate action by either.

"Fifth. That the following is the number of tons actually mined and dug from all of said leased premises during the following quarters, respectively:

| For the quarters ending | Lyman Lease. | Firmstone & Johnson Lease. | Harvey Lease. | Jones Lease. | Total. |
|---|---|---|---|---|---|
| Sept. 30, 1911 | 2,639 | 21,185 | 1,882 | 11,683 | 155,397 |
| Dec. 31, 1911 | 3,657 | 18,308 | 1,388 | 10,796 | 141,633 |
| March 31, 1912 | 1,669 | 18,882 | 1,462 | 12,484 | 144,229 |
| June 30, 1912 | 2,156 | 20,815 | 2,267 | 14,653 | 166,889 |

"Sixth. That the usual and ordinary royalty under mining leases in the New River district at the time of the execution of the leases and assignment aforesaid was 10 cents per ton royalty on coal actually mined.

"Seventh. That said defendant took possession of said leases and leaseholds shortly after January 1, 1901, and has since continuously mined coal therefrom to the present time. That J. A. McGuffin died on the 8th day of February, 1908, leaving a legal will, which has been duly probated in Kanawha county, by which will, after certain specific devises and bequests, he devised and bequeathed all of the rest and residue of his estate to his widow, Annette S. McGuffin, who afterwards married Frank Perkins, and that all of the interest of said John A. McGuffin in and under said assignment of January 1, 1901, constitutes a part of said rest and residue of said estate. All of the debts of said John A. McGuffin have been paid, and that if any royalties are due under said assignment of January 1, 1901, for the quarters ending September 30, 1911, December 31, 1911, March 31, 1912, and June 30, 1912, the plaintiff is entitled thereto.

"Eighth. That the Prudence Coal Company was chartered and organized at the instance of John A. McGuffin and solely by his attorneys, and the president and board of directors of such company, were such attorneys, and the assignment of January 1, 1901, from said McGuffin to said company, was drafted by his said attorneys and submitted to and accepted by said company, by its directors, while the directorate consisted of said attorneys only, and before any stock other than that of the original incorporators, who were said attorneys, was issued.

"Ninth. It is further agreed that the plaintiff, Annette S. Perkins, is a citizen and a resident of the state of Ohio, and that the defendant, Prudence Coal Company, is a corporation organized and existing under the laws of the state of West Virginia, and a citizen of such state, and is doing business in Fayette county, West Virginia, in the Southern district of West Virginia."

Upon the introduction of the foregoing documents and the agreed facts the plaintiff rested.

The defendant's contention was that the total cost of coal to the coal company was not to exceed 10 cents per ton and that losses by

reason of payments of minimum were recoverable from the plaintiff. In its account of offsets it claims to have paid more than 10 cents per ton on coal mined from the Jones property as follows:

| | |
|---|---:|
| 1907 | $ 964 76 |
| 1908 | 847 17 |
| 1909 | 122 01 |
| 1910 | 88 21 |
| 1911 | 678 98 |
| | $2,701 13 |

Evidence supporting this account was offered by the defendant, but the court, construing the contract as giving the plaintiff a right to 4½ cents per ton on coal mined from the Jones tract and to 4 cents per ton on the coal mined from the other tracts, regardless of the increase of cost to the defendant growing out of its failure to mine as much as the minimum, declined to allow the evidence to come in.

The Jones lease provided for a royalty of 5½ cents per ton, and the other leases for a royalty of 6 cents per ton. If all the leases had provided for a royalty of 6 cents per ton, the contract between Mc-Guffin and the coal company in all reasonable probability would simply have provided for the payment to McGuffin of 4 cents per ton on each ton mined, and in such event the claim of the defendant would have had no foundation. The confused language adopted by the draftsman was doubtless to be explained by the fact above mentioned. There was, however, a way open to the coal company by which it could pay to McGuffin 4½ cents per ton on all coal mined from the Jones land and 4 cents per ton on the remaining coal actually mined, and still pay not exceeding 10 cents per ton on the coal actually mined. The coal company had merely to exercise the foresight and the diligence necessary to mine at least the minimum provided for by the Lyman, Jones, and Firmstone & Johnson leases within the time of grace provided for.

[1] We find it unnecessary to construe the contract between Mc-Guffin and the coal company from the mere face of the paper. The provision for payments to McGuffin "at the same time or times that the original rents or royalties mentioned in said leases, are payable, respectively, to the several lessors therein named," and the total failure to provide for the contingency that has arisen, at least tend to support the conclusion of the court below. But, in any event, the parties have themselves construed the contract in accordance with the plaintiff's contention. Granting that from 1902 to May 1, 1906 (while Mc-Guffin was in charge of the company), the acts of the parties may perhaps not be satisfactorily regarded as a construction of the contract by both sides, their acts from May 1, 1906, until McGuffin's death in 1908 and thereafter until July 1, 1911, must be regarded as a sufficient reason for holding that both parties to the contract have construed it according to the contention of the plaintiff. 9 Cyc. 588; Chicago v. Sheldon, 9 Wall. 50, 54, 19 L. Ed. 594; Insurance Co. v. Dutcher, 95 U. S. 269, 273, 24 L. Ed. 410; Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057, 30 L. Ed. 1110; District of Columbia v. Gallaher, 124 U. S. 505, 510, 8 Sup. Ct. 585, 31 L. Ed. 526. It

follows that we find no error in the construction put upon the contract by the trial court.

[2] On the ground that there is no count in the declaration to cover the plaintiff's claim, or on which the bill of particulars could be founded, the defendant moved the trial court to strike out the evidence introduced by the plaintiff and to direct a verdict for the defendant. By statute assumpsit may be maintained on a sealed contract in West Virginia. The contract here had been executed prior to suit by plaintiff's testator, the event on which the payment sued for became due had happened, and as to such claims nothing remained to be done but payment by the defendant. Perkins v. Hart, 11 Wheat. 237, 251, 6 L. Ed. 463; Railroad Co. v. Lafferty, 2 W. Va. 104, 116; Moore v. Wetzell, 18 W. Va. 630, 640; Jackson v. Hough, 38 W. Va. 236, 18 S. E. 575, 576; Empire Co. v. Hull Co., 51 W. Va. 481, 41 S. E. 917, 920; Lord v. McCracken, 65 W. Va. 321, 64 S. E. 134, 135; Shipman, C. L. Pl. (2d Ed.) 22; 3 Standard Proc. 196. It is not an unreasonable inference from the agreed facts that the defendant had, prior to the suit, sold and been paid for the coal mined by it prior to June 30, 1912. The plaintiff's construction of the contract of January 1, 1901, being correct, we do no violence to the language of the fifth count of the declaration in holding that it adequately describes plaintiff's cause of action. To the extent of plaintiff's royalties the defendant had "had and received money for the use of" the plaintiff. Again, the ultimate object of the parties to the contract was that plaintiff's testator should be paid money for coal after it was mined. In this aspect the count for goods sold and delivered is sufficiently descriptive of the cause of action. However, we need not rest our decision here. There could have been no prejudice to the defendant from the trial court's ruling, unless the defendant was surprised. Not only did the bill of particulars filed with the declaration apprise the defendant of the exact nature of plaintiff's claim, but the account filed with the defendant's plea of offsets shows that defendant fully understood the plaintiff's case as it was subsequently set up by the evidence. We have no hesitation in affirming the action of the trial court here complained of.

The judgment below will be affirmed, at the cost of the plaintiff in error.

Affirmed.