BETHLEHEM STEEL CORP., *etc.*

*v.*

SHONK LAND CO., *etc., et al.*

(No. 15105)

Decided February 23, 1982.

*George G. Guthrie* and *Larry A. Winter, Willis O. Shay, Curtis H. Barnette* and *Kathleen M. Mills,* for appellant.

*Lewis, Ciccarello, Masinter & Friedberg, Arthur T. Ciccarello, Murray Lewis* and *Susan J. Becker,* for appellees.

HARSHBARGER, JUSTICE:

A predecessor of Shonk Land Company, Ltd. purchased 11,347.66 acres of land in Kanawha and Boone Counties in 1903. Cabin Creek Consolidated Coal Company leased the property in 1914 (all parties refer to this as the Base Lease) for a term ending December 31, 1948, and later leases extended the term until 1968. In 1936, Cabin Creek

transferred its interests in the Base Lease to Traux-Traer Coal Company which in 1947 erected a coal processing plant there, and then re-leased to Oglebay-Norton Coal Company. Bethlehem Steel, our appellant, acquired the Base Lease from Oglebay-Norton in July, 1967, and spent over six and one-half million dollars to modify the processing plant in 1971 and 1975.

The property has twenty-two seams of coal, seven of which are minable. Bethlehem operated six deep mines and had contracts with Fletcher Mining Co., Inc. and Mynu Coals, Inc. to do other mining. Such large-scale operations were possible because the property has the coal preparation plant, and tipples, railroad sidings, buildings and other necessary appurtenances.

An Amendment of Lease between Shonk and Bethlehem was signed in January, 1968. Its fourth "WHEREAS" paragraph declared that it "shall contain all the rights and obligations of Lessor and Lessee, with respect to the lands, property and rights leased to Lessee by Lessor." Paragraph 1 iterated that the Amendment was to be used "without reference to the Base Lease, as amended." Because of the complexity of issues about this document, we include it as Appendix A.

The Amendment was to expire January 1, 1978, unless Lessee gave Lessor written notice to renew and had performed its covenants. On June 22, 1977, notice of renewal until December 31, 1987 was sent to Shonk by Bethlehem Steel. Shonk replied in November, 1977, that Bethlehem had breached Paragraphs 5, 12, 13, and 16 (Appendix A), and unless the breaches of Paragraph 5 were cured in thirty days and of Paragraphs 12, 13 and 16 in sixty days, Shonk would declare a forfeiture, reenter, take possession of all improvements and pursue all its legal and equitable remedies. It also informed Bethlehem that these defaults, even if cured, had caused it to reject a term extension.[1]

---

[1] The differences, in effect, between simple nonrenewal, and forfeiture, are these: If the lease had not been renewed, Bethlehem would have had to relinquish the premises, giving Shonk the option

Bethlehem attempted to cure its defaults and also sought a declaratory judgment in Kanawha County Circuit Court. Shonk counterclaimed for declaration of forfeiture and for damages. After Bethlehem put on its proof, the trial judge, sitting without a jury, granted Shonk's motion for a directed verdict and declared a forfeiture. Shonk presented its damage claims and was awarded $10,344,219.82 and interest and costs.

Shonk based its forfeiture claim upon Bethlehem's alleged defaults in (1) failing to pay royalties on raw coal as opposed to processed coal; (2) failing to pay any royalties on two mines; (3) using a deep mine royalty rate, instead of a strip mine rate, for coal removed by punch mining; (4) trespassing on a 30.1 acre tract not included in the Lease; (5) failing to provide mine and operation maps; and (6) failing to conduct mining operations in a workmanlike and legal manner. Bethlehem had held over its tenancy while this matter was in litigation, and so we also have a question of holdover damages.

## FACT-FINDING

A trial court's findings of fact will be affirmed unless plainly wrong or against the clear preponderance of the evidence. *Frasher v. Frasher*, ___ W.Va. ___, 249 S.E.2d 513 (1978); W. Va. Rules of Civil Procedure, Rule 52(a). The evidence here was often contradictory, but we find no trial court error in his factual findings. All issues for resolution are legal and we include as Appendix B Judge Patrick Casey's conclusions of law that accompanied his order directing a verdict for Shonk.

## FORFEITURE

Our primary difficulty with the eminent trial court's conclusions is the forfeiture. We do not agree that Bethlehem's defaults justify the wholesale forfeiture of

---

to purchase its improvements. Forfeiture would permit Shonk to reenter, take possession of and title to improvements, and sue for damages.

improvements, equipment and personal property.[2] Shonk can be made whole by monetary damages *and* by allowing it not to renew the lease, *McCartney v. Campbell,* 114 W.Va. 332, 171 S.E. 821 (1933); *Galvin v. Southern Hotel Corp.,* 154 F.2d 970 (4th Cir. 1946), *aff'd.,* 164 F.2d 791 (1947); *Pyle v. Henderson,* 65 W.Va. 39, 63 S.E. 762 (1909).

Legal principles about forfeitures are clear in federal and West Virginia law. As early as 1881, Mr. Justice Woods declared:

> Where a penalty or a forfeiture is inserted in a contract merely to secure the performance or enjoyment of a collateral object, the latter is considered as the principal intent of the instrument, and the penalty is deemed only as accessory. *Sloman v. Walter,* 1 Bro. Ch. 418; *Sanders v. Pope,* 12 Ves. Jr. 282; *Davis v. West,* id. 475; *Skinner v. Dayton,* 2 Johns. (N.Y.) Ch. 526.
>
> *But in every such case the test by which to ascertain whether relief can or cannot be had in equity, is to consider whether compensation can or cannot be made.*
>
> *Klein v. Insurance Co.,*
> 104 U.S. 88, 90, 26 L.Ed. 662
> (1881).   (Emphasis added.)

Our Court wrote:

> Forfeitures of estates are not favored in law. The right to forfeit must be clearly stipulated for in terms, else it does not exist. Every breach of a covenant or condition does not confer it upon the

---

[2] The Court's findings of fact stated the extent of property forfeited:

"12. That the property had a processing plant located on it and forfeited to Defendant having a reconstruction value of $20,000,000.00.

"13. That as of January 1, 1978, the Plaintiff had upon the property, and forfeited to Defendant, four sections of deep mining equipment together with other equipment, sidings, tipples and other improvements.

"14. That as of January 1, 1978, the Plaintiff had upon the property, and forfeited to Defendant, several houses, buildings and mobile homes."

injured party. It never does, unless it is so provided in the instrument. Such breaches are usually compensable in damages, and, if a forfeiture has not been stipulated for, it is presumed that the injured party intended to be content with such right as is conferred by the ordinary remedies. *The broken covenant or condition relied upon for forfeiture must be found not only in the instrument, by clear and definite expression, but also within the forfeiture clause, by such expression.* A covenant or condition merely implied, or an express one not clearly within the forfeiture clause, will not sustain a claim of forfeiture by reason of its breach. *Peerless Carbon Black Co. v. Gillespie,* 87 W.Va. 441, 105 S.E. 517. . . .

Another principle to be observed is that, in so far as a covenant is relied upon to sustain a claim of forfeiture, it is always strictly construed in respect of that claim. The instrument must give the right of forfeiture in terms so clear and explicit as to leave no room for any other construction, or it does not exist. . . .

When the right has been clearly and unequivocally secured by the terms of the contract, it does not accrue unless nor until there has been an equally clear and unequivocal breach of the condition.
*Easley Coal Co. v. Brush Creek Coal Co.,* 91 W.Va. 291, 296-8, 112 S.E. 512, 514-15 (1922). (Emphasis added.)

We recognize that forfeiture was provided for in Paragraph 18 of the Amendment of Lease (Appendix A): "If . . . default shall be made by Lessee in the performance of any other covenant or condition herein contained . . . then Lessor, at its option may . . . (a) declare a forfeiture . . ." This nonspecific reference to breached covenants does not meet the strict standards for valid forfeiture clauses in *Easley Coal, supra.* Its language, which we emphasized, requires that a covenant relied upon for raising forfeiture be clearly and definitively expressed in a forfeiture

clause. A catchall, dragnet forfeiture clause for breach of any contractual covenant is inadequate.

The common law recognized, and statutes reinforce, a right to resort to equity to avoid forfeiture. *Kincaid v. Patterson,* 129 W.Va. 234, 39 S.E.2d 920 (1946); 11B Michie's Jurisprudence, *Landlord and Tenant,* § 44 (1978); 49 Am.Jur.2d *Landlord and Tenant,* § 1076 *et seq.* (1978); 51C C.J.S., *Landlord and Tenant,* § 102, *et seq.* (1968). This text, from *Beech Fork Coal Co. v. Pocahontas Corporation,* 109 W.Va. 39, 45, 152 S.E. 785, 787-88 (1930), teaches:

> "Equity will generally relieve from a forfeiture, claimed for failure to pay rent, when the default was not willful, and application for relief is seasonably made." Engel v. Eastern Oil Co., 100 W.Va. 301, 130 S.E. 491. In the opinion it is stated: "Equity will relieve from forfeiture in such case. 'It is well settled that, where the agreement secured is simply one for the payment of money, a forfeiture either of lands, chattels, securities or money, incurred by its nonperformance, will be set aside on behalf of the defaulting party, or relieved against in any other manner made necessary by the circumstances of the case, on payment of the debt, interest and costs, if any have accrued, unless by his inequitable conduct he has debarred himself from the remedial right or unless the remedy is prohibited under the special circumstances of the case by some other controlling doctrine of equity.' Pomeroy, par. 450. 'In cases of forfeiture for nonperformance of pecuniary covenants, relief in equity goes as a matter of course, where compensation may be made.' Wheeling & E. G. Ry. Co. v. Triadelphia, 58 W.Va. 487, 516, 52 S.E. 499, 511, 4 L.R.A. (N.S.) 321; Spies v. Ry. Co., [60 W.Va. 389, 55 S.E. 464], supra; Pheasant v. Hanna, [63 W.Va. 613, 60 S.E. 618], supra; South Penn Oil Co. v. Edgell, 48 W.Va. 348, 37 S.E. 596, 86 Am. St. Rep. 43; Lynch v. Versailles Fuel Gas Co., 165 Pa. St. 518, 30 A. 984.

The *Beech Fork* defaults, as these, involved more than rent, but our Court still refused to permit forfeiture.

Another fundamental forfeiture principle is that a lessor must act on the underlying breach rather than "[lull] the lessee into a feeling of security and [throw] him off his guard." *Hukill v. Myers*, 36 W.Va. 639, 15 S.E. 151, Syllabus Point 2 (1892). Then, a technical forfeiture at law will be relieved in equity, *Id.*, and parties must seek their remedies at law. *Pyle v. Henderson, supra* 63 S.E., at 764. Whatever may have been Shonk's right to enforce its lease early in the term, its failure to do so made forfeiture an unconscionable result.

As we recognized in Syllabus Points 1 and 2 in *Mundy v. Arcuri*, ____ W.Va. ____, 267 S.E.2d 454 (1980):

1. "Where a party stands by and sees another who, in good faith, deals with property inconsistent with the first person's interest and that person makes no objection, he is estopped to deny the validity of the action on the part of the second person; however, estoppel does not apply against one who is actually ignorant of his own rights in the property." *Thaxton v. Beard*, 157 W.Va. 381, 201 S.E.2d 298 (1973), Syllabus Point 2.

2. "Where a party knows his rights[3] or is cognizant of his interest in a particular subject-matter, but takes no steps to enforce the same until the condition of the other party has, in good faith, become so changed, that he cannot be restored to his former state if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. This disadvantage may come from death of parties, loss of evidence, change of title or condition of the subject-matter, intervention of equities, or other causes. When a court of equity sees negli-

---

[3] "Shonk Land Company, Ltd., is a West Virginia limited partnership organized in 1976. It consists of seven general partners and sixty-one limited partners who acquired the partnership assets from its corporate predecessor, Shonk Land Company. Shonk's primary business consists of the lease and sale of various properties by Shonk for timbering or the mining of coal, oil and gas. The leasehold, which is the subject of this litigation, is owned by Shonk and constitutes one of its most valuable assets." Brief of Appellees, Shonk Land Company, Ltd., page 5.

gence on one side and injury therefrom on the other, it is a ground for denial of relief." *Carter v. Price*, 85 W.Va. 744, 102 S.E. 685 (1920), Syllabus Point 3. [Footnote added.]

And whether we deem such defaults waived; or find Shonk estopped from asserting them after Bethlehem relied on Shonk's acquiescence; or declare that principles of equity, fairness and conscionability prevent this forfeiture, Shonk is not aided by the Amendment of Lease.[4]

## RENEWAL

The "term" provision of the amended lease gave Bethlehem the right to renew "provided Lessee has performed its covenants hereunder." Paragraph 4, Amendment of Lease, Appendix A. The trial judge concluded in his Findings of Fact and Conclusions of Law:

14. That the Plaintiff has failed to perform the covenants of the Lease during the original term, as set forth herein, and therefore the Plaintiff cannot prevent the refusal by Defendant to renew the term of said Lease as provided in Defendant's Notice of November 16, 1977, and letter of January 6, 1978.

---

[4] "All of the remedies granted to Lessor herein shall be deemed to be cumulative and the exercise of any remedy shall not be considered as an election by Lessor of remedies or as a waiver of any other remedy specified in this article. Moreover, the specification of remedies in this article 19 shall not be deemed to exclude Lessor from any other legal or equitable remedy or remedies which it may have under the laws of the State of West Virginia. Failure on the part of Lessor to enforce any of the rights herein granted to it on default for any period or periods shall not operate as an estoppel or as a waiver against Lessor, or prevent it at any subsequent time from electing to exercise all or any of such rights for any subsequent default. In case any provision hereof shall be unenforceable or enforceable only to a limited extent, the inclusion herein of such provision shall not affect the validity of any other provision hereof, and any such provision which is enforceable only to a limited extent may be enforced to such extent with the same effect as if such provision had expressly provided in the alternative for the enforcement thereof to the extent to which such provision may be enforceable."

We agree. Bethlehem's conduct justified Shonk's refusal to permit renewal.[5]

Upon termination of the lease, "Lessor shall have an option to buy any or all of Lessee's machinery, equipment and improvements then upon the Leased Premises, at its then fair market value." Paragraph 20, Amendment of Lease, Appendix A. The 120-day option period shall commence when this opinion is filed, and if Shonk does not purchase Bethlehem's property, Bethlehem shall have one year after the 120-day option period to remove it.

## DEFAULTS

The material breaches for which Bethlehem is monetarily liable are (1) paying deep mine royalties for punch mining which should have been compensated at the strip mining rate, (2) failure to pay royalties on two mines, (3) trespass upon 30.1 acres, and (4) holdover damages. We disagree with the trial court's conclusions that royalties were due on run-of-mine coal and with its calculation of holdover damages.

### (A) ROYALTIES

The trial court found that Paragraph 5 of the Amendment of Lease required Bethlehem to pay tonnage royalties on run-of-mine or "raw coal",[6] but that Bethlehem for ten years paid, and Shonk accepted, royalties on processed, shipped weights.

The Base Lease (quoted here only to illustrate industry use of the term "run-of-mine") provided:

FIRST: That [Lessee] will pay to said Lessor, its successors or assigns, on or before the 25th day

---

[5] The defaults justifying nonrenewal, in addition to those mentioned *supra*, are failure to provide maps and failure to conduct lawful mining operations. *See* Appendix B. Paragraphs 4, 5, 6, and 7.

[6] "Run-of-mine", "mine run" or "raw coal" includes top rock, bottom rock, clay, shale, seam partings and other noncoal impurities. Testimony of Bethlehem and Shonk witnesses, Transcript, Volume 1, pp. 1236-1243; Volume 9, pp. 1390-1391; Volume 13, pp. 1962-1964. *See Hardin v. Thompson*, 22 Ky. Law Rep. 285, 57 S.W. 12 (1900); *Brokmeier v. Lamb*, 170 Minn. 143, 212 N.W. 187, 188 (1927); *City of St. Louis v. Triangle Fuel Co.*, 193 S.W.2d 914, 916 (Mo. App. 1946).

of each and every month during the continuance of the lease, eight cents for each and every ton of 2,000 pounds of *run of mine* coal mined during the preceding month.

Joint Exhibit No. 1,
Base Lease, 1914
(emphasis added).

The Amendment did not mention run-of-mine coal. Instead, it elaborately discussed royalty provisions separating different possibilities:

The Lessee shall pay to the Lessor as tonnage royalty:

(1) "[F]or each and every ton of two thousand (2,000) pounds of coal *mined and taken from the Leased Premises.*"

(2) "It is understood that . . . certain slate, refuse and like by-products of mining and that some commercial salvage or use may be made or obtained from said accumulations, present and future, and Lessee is granted the right to sell or dispose of such products. It is agreed that the Lessee shall pay to Lessor a sum equal to 10% of the selling price for all such products, F.O.B. the mine. Anything contained in the preceding sentence to the contrary notwithstanding, any coal produced by using refuse and like by-products from the Leased Premises shall be paid for in the same manner and at the same royalty rate as coal mined and produced and shipped from the Leased Premises."

(3) "As to coal mined on the premises and transported and shipped by railroad cars, which is not commingled with coal mined from other premises, the quantity of coal upon which the Lessee shall pay royalty shall be determined by railroad weights."

(4) "[A]s to the coal mined from the premises and transported by other means of transportation, and as to coal sold locally . . . the quantity of coal upon which the Lessee shall pay royalty shall be

determined by standardized weigh scales to be provided by the Lessee, and according to the scale books and accounts of the Lessee, or according to any further rule or regulation which may be prescribed by the Lessor and accepted by the Lessee for the correct ascertainment and report of the quantity of such coal."

(5) "As to coal mined from the Leased Premises and which shall be commingled at the tipple or loaded with coal from other premises, payment of royalty shall be based on railroad weights, but shall be prorated according to the computed tonnage shown to have been mined from the Leased Premises and other premises, respectively, during said period or periods, such proration to be based on mine car weights, or on weightometers, if belt conveyors are used, and/or by engineers' measurements and computations which shall be made according to usual, customary, modern and accurate methods, or by any other scientifically reliable and accurate appliance or method." (Emphasis added.)

Paragraph (3) *supra* had royalties measured by railroad weights for non-commingled coal shipped by railroad cars; and (5) had commingled coal shipped from the leased property measured by railroad weights, but prorated with tonnage from other mines, the proration factor being computed from mine car weights, weightometers or engineers' measures. The royalty tonnage in either case was to be calculated upon railroad car weights of coal. No unprocessed coal was shipped in railroad cars and, therefore, railroad car weights were necessarily the measure for processed coal tonnage.

Trial testimony revealed that Bethlehem used this method of computation from the inception of its leasehold in 1967. Shonk never challenged, questioned or investigated this methodology, although the Amendment of Lease, in Paragraph 14 (Appendix A), specifically granted Shonk inspection rights to ascertain "the condition of the mines, the methods practiced, *as well as the amount of coal removed.*" (Emphasis added.)

Our Fourth Circuit wrote about acquiesence to royalty payments:

> Granting that from 1902 to May 1, 1906 (while McGuffin was in charge of the company), the acts of the parties may perhaps not be satisfactorily regarded as a construction of the contract by both sides, their acts from May 1, 1906, until McGuffin's death in 1908 and thereafter until July 1, 1911, must be regarded as a sufficient reason for holding that both parties to the contract have construed it according to the contention of the plaintiff. *Prudence Coal Co. v. Perkins,* 217 F. 569, 574 (1914).

The court in *Prudence Coal Co.* decided that the parties had interpreted their contract by five years of consistent conduct. *Accord, Beech Fork Coal Co. v. Pocahontas Corporation, supra; Ackerman v. Sterling Paving Co.,* 497 P.2d 699 (Colo. App. 1972); *Hall v. Landrum,* 470 S.W.2d 830 (Ky. App. 1971).

Our interpretation that royalty payments were to be made on railroad weights and not run-of-mine coal (except as materials separated therefrom might be sold as refuse or coal) is consistent with Bethlehem's conduct. Shonk's ten-year failure to object to those royalty calculations[7] reinforces our reversal of the trial court's determination that royalties were due on run-of-mine coal.[8] Therefore,

---

[7] The trial court also found that by paying royalties only on metallurgical quality coal, which was what processing developed, Bethlehem did not pay royalties on all "minable and merchantable" coal. But the Amendment of Lease did not require that any specific quality of coal be used by Lessee for royalty calculations. Coal that did not meet specific gravity weights for metallurgical purposes became refuse and was subject to royalties by section 5 of the Amendment of Lease. Also, the term "minable and merchantable" coal is used only in sections four and seven—neither of which pertain to quantities of coal to be used for calculating royalties.

[8] If Shonk were correct in its interpretation, Bethlehem would have to pay for raw coal that included refuse, then pay ten percent on any of the refuse sold (except coal), and then pay the regular tonnage royalty on any coal derived from the refuse and sold. The mere mention in the Amendment of Lease that there might be coal sold from refuse, would seem to contradict Shonk's argument about run-of-mine coal.

this trial court's award of $571,436.06 plus six percent interest, or a total of $754,994.22 damages, for unpaid royalties on run-of-mine coal is reversed.

The other alleged royalty default is Bethlehem's admitted failure to pay royalties on two mines. It offered to cure this default prior to trial. We affirm the trial court's $8,770.93 damage award, compensating Shonk for these unpaid royalties.

(B) *PUNCH MINING*

We affirm Judge Casey's finding that Fletcher Mining Company, a contract miner on the premises, was punch mining, and in doing so disturbed the overburden, and should be charged at the strip mining royalty rate. Bethlehem admitted that the "facing up" process involved in punch mining disturbed the overburden. The Amendment of Lease explicitly provided that a twelve cent per ton rate applied to coal produced by "deep mining methods including punch mining where the overburden is *not* disturbed," (emphasis added); but when overburden is disturbed, punch mining becomes more akin to strip mining and the coal product must be paid for at the strip mining rate. Bethlehem must reimburse Shonk for the difference in royalties, determined by the trial court to be $12,647.61, plus six percent interest, totaling $18,724.46.

(C) *TRESPASS*

Shonk asserted Bethlehem trespassed on a 30.1 acre tract not included in their lease. Bethlehem had three mines in the tract and paid royalties to adjoining landowners.

The trial court found this an innocent trespass, assessing damages to be the market value of coal when taken, less reasonable cost of removal. This standard is correct. *Pan Coal Company v. Garland Pocahontas Coal Co.*, 97 W.Va. 368, 388, 125 S.E. 226, 234 (1924); *Spruce River Coal Company v. Valco Coal Co.*, 95 W.Va. 69, 70-1, 120 S.E. 302, 303 (1923); *accord Thaxton v. Beard*, 157 W.Va. 381, 201

S.E.2d 298 (1973); *Condry v. Pope*, 152 W.Va. 714, 166 S.E.2d 167 (1969).

Bethlehem claimed that the court's damages assessment was wrong because severance costs deducted from market value were not equated with ultimate marketing costs.

> The trespasser, when he seeks to reduce the amount of the recovery by the amount expended in mining the coal, and bringing it to the pit mouth, does so, not on the theory that it became defendant's coal when it was severed from the vein, but on the ground that he has in good faith, in an honest belief that he had the right, expended labor and money on plaintiff's property, before it was converted, and therefore is entitled to the amount of his expenditures.
> *Pan Coal Company v. Garland*
> *Pocahontas Coal Co., supra*
> 125 S.E., at 233-34.

The court correctly used Fletcher's mining contract rate without processing costs. We stated in *Spruce River Coal Company v. Valco Coal Co., supra* 120 S.E., at 303:

> It is doubtful whether defendant should be credited with any overhead expense. The rule of the *Pentress* Case is the value of the coal after its severance, less the proper expense of severance. It certainly would not be proper, in ascertaining damages for the coal taken, to credit the trespasser with the large overhead expense claimed in this case.

The factual data underlying these calculations is disputed, but without evidence that the trial court was clearly wrong, we affirm his $1,207,009.60 damage determination for trespass. *Stonega Coke & Coal Co. v. Price*, 116 F.2d 618 (4th Cir. 1940); *Burns v. Goff*, 164 W.Va. 301, 262 S.E.2d 772 (1980).

(D) *HOLDOVER DAMAGES*

When Bethlehem was notified that its renewal effort would not be accepted by Shonk, it attempted to cure

defaults, initiated this action to declare the parties' rights, and held the property past its term. The trial court made findings about Bethlehem's failure to surrender the premises?[9] and adopted rent and royalty rates directly

---

[9] These are some of the trial court's additional findings of fact on damages:

"10. That the Plaintiff mined and produced from Defendant property, 260,793 tons of processed coal and 170,937 tons of raw coal from January 1, 1978, through September 30, 1979.

"11. That 1,087,083 tons of clean coal was processed through the processing plant from January 1, 1978, through September 30, 1978.

. . .

"15. That from January 1, 1978, through September 30, 1979, there was 1,444,783 tons of coal transportation across Defendant's property from other properties, not owned by Defendant, but used by Plaintiff for its other coal mining operations.

"16. That the market value of the coal mined and processed by the Plaintiff on Defendant's property from January 1, 1978, through September 30, 1979, was $45.43 per ton.

"17. That the reasonable fee to process coal in the processing plant on Defendant's property from January 1, 1978, through September 30, 1979, was $2.80 per ton.

"18. That the reasonable fee for wheelage of coal transported across Defendant's property from properties not owned by Defendant is $.25 per ton from January 1, 1978, through September 30, 1979.

"19. That Mynu Coal, Inc. sold 170,759 tons of coal, produced from Defendant's property, from January 1, 1978, through September 30, 1979, at an average price of $27.38 per ton and that the cost of removal of said coal for sale was $16.76 a ton, or a total difference of $1,812,436.00.

"20. That the Plaintiff produced an average of 600,000 tons of processed coal per year from Defendant's property, during the ten year term of the Amendment of Lease, and that 600,000 tons per year of processed coal could have been produced from the property from January 1, 1978, through November 30, 1979.

"21. That the Plaintiff did not attempt to produce as much coal after January 1, 1978, as it did prior to January 1, 1978, because of the institution of litigation and the declaration of forfeiture of the lease by Defendant.

. . .

"25. That the [Shonk] letter of January 6, 1978, demanded the plaintiff to surrender the leased premises together with all the improvements, equipment, personal property and building upon Defendant's property.

from a letter Shonk sent Bethlehem requiring it to surrender the premises. For example, Bethlehem was obligated by the Amendment of Lease to pay $54,000 per year minimum royalty and Shonk demanded $1,900,000 per year.

"26. That the Plaintiff refused to surrender the leased premises, improvements, equipment, personal property and buildings on Defendant's property and elected to maintain possession thereof.

"27. That the letter of January 6, 1978, advised the plaintiff that it it refused to surrender said property and continued in possession of said property then the rent and royalty to be paid would be:

"a) $1,900,000.00 in minimum annual royalty.

"b) $3.28 per ton on all coal mined and removed.

"c) $1.20 per ton on all coal cleaned and processed through the preparation plant.

"d) $100,000.00 per month for rental of equipment.

"e) $10,000.00 per month for building rentals.

"f) $.50 per ton for wheelage on coal transported across defendant's property from other properties.

"28. That the minimum annual royalty of $1,900,000.00 set forth in the letter of January 6, 1978, was based upon a royalty of eight per cent (8%) of a market price of $41.00 per ton of processed coal and upon a production of 600,000 tons per year.

"29. That the $3.28 per ton royalty as set forth in said letter of January 6, 1978, was based upon a royalty of eight per cent (8%) of a market price of $41.00 per ton of processed coal.

"30. That the $1.20 per ton fee for processing coal through the preparation plant was based upon Defendant's estimation of a reasonable return for preparing coal.

"31. That the $10,000.00 per month rental on buildings demanded in said letter of January 6, 1978, was based upon Defendant's expectations of reasonable rental for houses and office buildings on their property.

"32. That the $100,000.00 per month rental on equipment demanded in said letter of January 6, 1978, was based upon the value of return on four sections of deep mining equipment together with all other equipment on Defendant's property.

"33. That the $.50 per ton wheelage charge for coal transported across Defendant's property from other properties not owned by Defendant, and demanded in its letter dated January 6, 1978, was based upon Defendant's expectations of reasonable charges.

"34. That the Plaintiff did not disagree or challenge the amount of the charges, rents and royalties demanded by the Defendant in its letter of January 6, 1978, and Plaintiff had full knowledge of same.

"35. That the amount of royalty to which Defendant is entitled from January 1, 1978, through November 30, 1979, based on the letter demand of January 6, 1978, is $3,641,666.59.

A lessee who remains on leased premises without lessor's consent and after termination of lease term becomes a trespasser. *Angel v. Black Band Consol. Coal Co.*, 96 W.Va. 47, 122 S.E. 274 (1924), Syllabus Point 6 ("[W]hen the first notice to vacate was given, he was there with defendant's consent, hence a tenant at will. He

---

"36. That the amount of processing charges due to Defendant from January 1, 1978, through September 30, 1979, based on the letter of January 6, 1978, calculated at $1.20 per ton on 1,087,083 tons of coal processed is $1,304,499.60.

"37. That the amount of rental for equipment on Defendant's property from January 1, 1978, through November 30, 1979, due to the Defendant, based on the letter demand of January 6, 1978, is $2,300,000.00.

"38. That the amount of rental of houses, buildings, and trailers on Defendant's property from January 1, 1978, through November 30, 1979, due to Defendant, based on the letter of demand of January 1, 1978, is $230,000.00.

"39. That the amount of wheelage charges due to the Defendant, based on its letter demand dated January 6, 1978, and calculated at $.50 per ton on 1,447,767 tons of coal transported across Defendant's property by Plaintiff from other properties not owned by Defendant is $722,383.50.

"40. That the Plaintiff has paid to Defendant during the period from January 1, 1978, through September 31, 1979, the sum of $112,162.30 in royalties and $105,441.13 in real estate taxes.

"41. That the Plaintiff paid to the Defendant during the 10 year term of the Amendment of Lease from January 1, 1968, through December 31, 1977, $999,271.06 in royalties.

"42. That the total amount of damages due to Defendant from Plaintiff resulting from nonpayment of proper royalties on coal mined by Plaintiff, on damages resulting from mining 30.1 acres of coal not under lease to Plaintiff and owned by Defendant, and for holding the property by Plaintiff after Defendant terminated the Amendment of Lease dated January 1, 1968, is $10,188,048.79 less the amount paid by Plaintiff to Defendant as royalty from January 1, 1978, through September 30, 1979, of $112,162.30 or a total $10,075,886.49.

"CONCLUSIONS OF LAW

". . .

"14. That the Defendant is entitled to recover from the Plaintiff as damages, rents and royalties for its wrongful possession of the leased premises from January 1, 1978, through November 30, 1979, the sum of $10,075,886.49."

Record, pp. 1006-1012

therefore would not be a trespasser until his tenancy was terminated. But after it was terminated, he became a trespasser by remaining . . . ." *Id.*, 122 S.E.2d at 278.) The measure of damages for trespass to realty "is the rental value of the property wrongfully occupied and withheld, with compensation for injury to the residue thereof." *Lyons v. Fairmont Real Estate Co.*, 71 W.Va. 754, 77 S.E. 525, 528 (1913). There are no allegations of injuries to the residue. It is axiomatic, in the absence of statutes providing multiple damages for a tenant's willful failure to surrender leased premises, that a lessor is entitled to the reasonable rental value of property wrongfully withheld by a lessee.[10] 49 Am.Jur.2d, Landlord and Tenant, § 1124, *et seq.* (1970 and Supp.); 52A C.J.S., Landlord and Tenant, § 750 (1968 and Supp.); Annot., Measure of damages for tenant's failure to surrender possession of rented premises, 32 A.L.R.2d 582 (1933 and later case service).

For mineral leases reasonable rental value is synonomous with reasonable royalties. In a tax case, this Court discussed the nature of mineral royalties:

> The meaning of the term royalty is well understood. As applied to the mining industry it is a payment to the owner of minerals in place for the privilege of removing and appropriating the same, and is ordinarily based upon the quantity of the mineral produced.
>
> Royalty, . . . was a portion of the mineral or the payment made for the privilege of extracting minerals or for the use of a mine, or of the land, for that purpose. . . . The very word itself, therefore, embodies, historically and theoretically, not principally the element of transferring title to the mineral, but rather the basic idea of payment for

---

[10] We need not consider special damages allowable in these cases, because there are none here. *Lewis v. Welch Wholesale Flour and Feed Co.*, 96 W. Va. 694, 123 S.E. 801 (1924). On statutory damages, *see* Annot., What constitutes wilfulness or malice justifying landlord's collection of statutory multiple damages for tenant's wrongful retention of possession, 7 A.L.R.4th 589 (1981).

the use of the mine or of the premises, with the acquisition of title to the severed mineral as incidental. The Legislature, therefore, had a basis in law and in fact for classifying royalties along with rentals, fees and interest, as income from the use of real or personal property.

> *Koppers Coal Company v. Alderson,*
> 125 W.Va. 747, 753, 26 S.E.2d 226
> (1943).

Judge Rose explained that coal leases that include minimum rentals or royalties (when the amount of mined coal produces insufficient royalties) indicate that payments called "royalties" encompass more than payment for severed coal *per se.* Royalties include the privilege to extract minerals, use the realty, and all property that is leased with it. Where a mineral lease does not make separate provisions for rental of buildings, equipment, improvements or machinery, royalty payments represent the entire "rental value" of the leasehold. Shonk's and Bethlehem's lease limited payments to royalties. The trial court erred in assessing separate damages for use of buildings, equipment, processing, and such.

The trial court found, as indicated in Footnote 9, *supra,* that Bethlehem produced coal on the premises from January, 1978 until the end of September, 1979. Bethlehem should pay either reasonable royalties on coal mined, or a reasonable minimum royalty, whichever is greater. If Bethlehem's reduced production after January, 1978, *see* Footnote 9, Finding 20, was because of Shonk's assertion of forfeiture and this litigation, there should be no additional charges for its failure to produce as much coal as it did before Shonk's forfeiture declaration.

We remand this damage assessment to the trial court to determine reasonable royalties for the holdover period after January, 1978. The court will deduct from reasonable royalties all amounts paid by Bethlehem in royalties between January, 1978 and October 1, 1979.

## CONCLUSION

Bethlehem's defaults deprived it of the opportunity to renew its leasehold, but did not justify forfeiture.

Shonk can purchase any of Bethlehem's machinery, equipment and improvements at fair market value (as agreed upon by the parties or by arbitration) within 120 days from the date this opinion is filed.

Bethlehem is entitled to remove its property not purchased by Shonk and can remove it at anytime within one year after Shonk's option to purchase ends.

The items of damages found by the trial court are now in this posture:

    (a) Award of $754,994.22 damages and interest for unpaid royalties on run-of-mine coal is reversed;

    (b) Award of $8,770.93 for failure to pay royalties on two mines is affirmed;

    (c) Award of $18,724.46 for the difference in royalties on punch mining is affirmed;

    (d) Award of $1,207,009.60 for innocent trespass of 30.1 acres is affirmed;

    (e) Award of holdover damages is reversed and remanded for further action consistent with this opinion.

This case is remanded to the Kanawha County Circuit Court for further proceedings consistent herewith.

*Affirmed in part;*
*reversed in part;*
*and remanded for*
*further proceedings*
*consistent with*
*this opinion.*

### APPENDIX A

Plaintiff's Exhibit No. 2

THIS AMENDMENT OF LEASE, Made as of the 1st day of January, 1968, by and between SHONK LAND

COMPANY, a corporation organized and existing under the laws of the State of West Virginia (hereinafter called Lessor), party of the first part, and BETHLEHEM STEEL CORPORATION, a corporation organized and existing under the laws of the State of Delaware (hereinafter called Lessee), party of the second part,

WHEREAS, by Deed (of Lease) dated July 1, 1914 (hereinafter called Base Lease) Shonk Garrison Coal Company leased to Cabin Creek Consolidated Coal Company certain lands, property and rights in land described therein as located in Kanawha County, West Virginia, but actually located in Kanawha and Boone Counties, West Virginia, which is recorded in the office of the Clerk of the County Court of Kanawha County, West Virginia, in Deed Book 154, page 588; and

WHEREAS, since July 1, 1914. Base Lease has been modified in many respects, including by way of illustration and not limitation

(a) additions to and releases from the Base Lease of coal, surface and other properties and rights;

(b) extension of the term from time to time;

(c) modification of the terms and provisions relating to mining, use of the land, wheelage charges, etc.; and

(d) granting of many rights-of-way and easements and land for the installation of power lines, railroads, pipelines, telephone lines and other uses; and

WHEREAS, Lessor is now the successor to the rights of Shonk Garrison Land Company and Lessee has by mesne assignments, the latest dated July 1, 1967, effective December 1, 1967, from Oglebay Norton Company to Lessee, acquired the rights of the Lessee under the Base Lease as modified, amended and changed over the years; and

WHEREAS, the parties hereto now desire to restate in this Amendment of Lease their rights and obligations

derived from the Base Lease, as heretofore amended, and to embody in this Amendment of Lease all changes both in the property under lease and the terms and conditions relating thereto and to amend further the terms and provisions of the Base Lease as heretofore amended so that this Amendment of Lease shall contain all the rights and obligations of Lessor and Lessee with respect to the lands, property and rights leased to Lessee by Lessor under the Base Lease as amended. Whenever in this instrument reference is made to "Lease" it shall refer to the Base Lease as heretofore amended and as amended by this instrument.

NOW, THEREFORE,
THIS AGREEMENT WITNESSETH:

AMENDMENT OF BASE LEASE

1. The parties hereto do further amend the Base Lease by striking from the Base Lease, as heretofore amended, all provisions and amendments of every kind, whether written or oral, inconsistent with the terms of this Amendment of Lease, and by adding to the Base Lease all provisions herein not found in the Base Lease as heretofore amended so that although the parties recognize that their rights and obligations are those derived from the Base Lease as amended, this Amended Lease shall fully describe the property subject to the Base Lease, as amended, and shall fully set out the rights, duties and obligations of the parties without reference to the Base Lease or any prior amendment whether written or oral and, accordingly, the Base Lease as amended by this Amendment of Lease does let, lease and demise to Lessee for the purpose of mining coal, the land and property mentioned and generally described in Schedule A attached hereto (including the map attached as a part of Schedule A) under the terms and conditions herein set forth. The land generally described in Schedule A is referred to as Leased Premises and the coal therein as Leased Coal.

## SURFACE RIGHTS

2. With respect to that portion of the Leased Premises where Lessor owns the surface and the mineral (other than oil and gas), Lessor grants to the Lessee for the purpose of mining, removing, gathering, storing, preparing for market, transporting and shipping coal from the Leased Premises and any other lands whatsoever, such mining rights, auxiliary privileges and easements as may be necessary and convenient to the Lessee.

Without limiting the generality of this grant of rights incidental and auxiliary to mining said coal, it is understood that the grant herein of said coal is made *together with* the right to mine by any method or process, including deep mining and punch mining, and, where Lessor has the necessary surface rights, by strip mining and auger mining, all the coal without liability for depriving the surface or any strata of the Leased Premises of lateral or subjacent support; the right to haul through, over and under the Leased Premises coal produced from the Leased Premises and from any other lands whatsoever and to store refuse from any coal in the workings and passageways in the Leased Premises; the right to use so much of the surface of the Leased Premises (where Lessor owns the surface) as Lessee may desire for the erection, maintenance and operation of mining structures, buildings, cleaning and preparation plants with appurtenant facilities including, but not limited to tipples, railroad sidings, loading facilities, shops and offices, and power lines, tracks, tramways and equipment, and for drainage, ventilation, haulage, refuse dumps and other purposes in connection with the mining and removal of the Leased Coal and of coal produced from lands other than the Leased Premises; and the right to use, in connection with mining operations of the Lessee on, in or under the Leased Premises, sand, rock, water and other substances found on, in or under the Leased Premises the removal of which will facilitate orderly mining and carrying away of

the Leased Coal, all insofar as the Lessor has the right to release without liability for injury or damage that may result to springs, wells or watercourses in, on or under the Leased Premises. Lessee covenants that it will at all times during the term of this lease keep all buildings, tipples, structures, machinery and equipment currently in use as well as its workings underground in good order and repair and will from time to time make such replacements, renewals and additions as may be reasonably necessary to enable Lessee at all times to perform its obligations hereunder according to improvements made from time to time in the art of coal mining and coal preparation.

With respect to that portion of the Leased Premises where Lessor does not at the date of this Amendment of Lease own the surface, or owns the surface subject to existing easements, public or private, Lessor grants to Lessee the same mining rights, privileges and easements as Lessor possesses or has the right to utilize.

EXCEPTING AND RESERVING, NEVERTHELESS, to the Lessor, its successors and assigns, all rights not specifically granted herein including but not limited to

(a) all oil and gas within or underlying the demised premises, together with the right to drill and bore for and sink shafts for the purpose of testing and exploring for and removing oil and gas, and the right to market and remove oil and gas when found and to lay pipe lines and erect and install such other structures, machinery or appliances on demised premises as may be necessary for the removal of oil and gas;

(b) all timber, together with the right to cut, haul, remove and transport the same;

(c) the surface of said land not necessary to the operations of the Lessee, subject, however, to the Lessee's rights given hereunder. Before selling or leasing any surface or granting any easement thereon the Lessor shall consult with the Lessee.

The reserved rights shall be exercised in such a way as not to interfere unreasonably with the operations, rights and privileges of the Lessee herein granted.

## *EXCHANGE OF LANDS*

3.   This Lease is made subject to the right of the Lessor with the approval of Lessee to make exchanges of small parts or portions of any of the Leased Premises or of all or any of the veins or seams of coal hereby leased with the owners of adjoining property or the owners of any seam adjoining the exterior boundary lines of the Leased Premises for the purpose of straightening the said exterior boundary lines or for the purpose of consolidating some of the holdings. If any such exchanges are made coal acquired by the Lessor in such exchange shall automatically be included in and become a part of this Lease and the coal embraced herein exchanged by the lessor shall automatically be released and excluded from this Lease. Lessor hereby grants to Lessee the right to penetrate any and all seams to the boundary lines of adjoining properties in which the Lessee has the right to mine coal.

## *TERM*

4.   The initial term of this Lease shall expire January 1, 1978. Thereafter Lessee shall have options to renew or extend this Lease, on the same terms and conditions except as to term for two (2) successive ten (10) year periods provided Lessee has performed its covenants hereunder, and gives Lessor written notice of its intent to renew ninety (90) days before the expiration of each preceding term. Whenever by reason of the thinness of or other inherent defect in any seam of coal upon the Leased Premises the Lessee cannot begin mining or profitably continue the business of mining and shipping coal from said seam or the merchantable and minable coal as defined in Article 7 hereof in any of said seams shall be exhausted, then and in either event the Lessee shall not

be required to work or continue working in said seam but shall continue to work the other minable seams, if any, in the Leased Premises during the remainder of the term of this lease, as herein provided; but the term shall end and this lease may be terminated at the election of the Lessee when there are no more seams which can be mined profitably because of the thinness of the coal or mining conditions.

IN consideration whereof, the Lessee does hereby covenant, promise and agree to and with the Lessor as follows:

### TONNAGE ROYALTIES

5. The Lessee shall pay to the Lessor as tonnage royalty for each and every ton of two thousand (2,000) pounds of coal mined and taken from the Leased Premises and for coal used on the premises, except such coal as is used by the Lessee in the processing and preparation of coal for market, the following: (a) the sum of twelve cents (12¢) per ton for coal mined by deep mining methods, including punch mining where the overburden is not disturbed; (b) the sum of twenty five cents (25¢) per ton for coal mined by strip mining methods; and (c) the sum of thirty cents (30¢) per ton for coal mined by auger mining methods. All of said tonnage royalties shall be increased one cent (1¢) per ton on January 1, 1973, and shall be increased an additional one cent (1¢) per ton on January 1 of each succeeding fifth year thereafter during the term of this lease, or any renewal or extension thereof. The tonnage royalty shall be paid on the 25th day of each month covering production of the preceding month.

It is understood that either through the process now or heretofore employed in the obtaining of coal mined from the Leased Premises, or by other cleaning plant or plants later erected thereon, there has already accumulated and will be produced in the future, certain slate, refuse and like by-products of mining and that some commercial salvage or use may be made or obtained from said

accumulations, present and future, and Lessee is granted the right to sell or dispose of such products. It is agreed that the Lessee shall pay to Lessor a sum equal to 10% of the selling price for all such products, F.O.B. the mine. Anything contained in the preceding sentence to the contrary notwithstanding, any coal produced by using refuse and like by-products from the Leased Premises shall be paid for in the same manner and at the same royalty rate as coal mined and produced and shipped from the Leased Premises.

## MINIMUM ROYALTIES

6. The Lessee shall pay to the Lessor in respect of the calendar year in which this Amendment of Lease shall be executed and delivered and in respect of each subsequent calendar year during the term hereof and any renewal or extension hereof the sum of Fifty-four Thousand Dollars ($54,000.00) as a minimum royalty to be paid in equal quarterly installments of Thirteen Thousand Five Hundred Dollars ($13,500.00) each on or before the 25th day of April, July, October and January during the term hereof and any renewal or extension hereof against which the Lessee may use as a credit any amount paid as tonnage royalty in respect of coal mined during such calendar quarter. In case the Lessee in any calendar quarter shall fail to mine sufficient coal to equal the minimum royalty at the then current rate of tonnage royalty, it shall have the privilege during the following twenty (20) calendar quarters, but not thereafter, of mining free from tonnage royalty such an amount of coal as at the current tonnage royalty will reimburse Lessee for the deficiency without interest. No payment in excess of the minimum royalty for any quarter shall be credited against a deficiency in any subsequent quarter and no coal shall be mined free of tonnage royalty in any quarter until a sufficient quantity of coal shall have been mined in such quarter to amount at the current tonnage royalty rate to the minimum for such quarter.

If in any year the Lessee is prevented for any period of sixty (60) consecutive days from operating its mines by reason of any strike, at the mine or elsewhere, or by riot, fire, explosion, flood, invasion, act of God or the public enemy, unavoidable accident, legally enforceable closure orders issued by agents of the State or Federal governments, car shortage or other causes beyond its control, the obligation on the part of the Lessee to pay minimum royalty shall be suspended for that portion of said year during which such conditions shall exist, but not to exceed six (6) months in any one calendar year, and payment of minimum royalty shall be prorated accordingly.

### MINABLE AND MERCHANTABLE COAL

7.  By the term "minable and merchantable" coal, as used in this Lease, is meant coal which when reached in the prosecution of Lessee's operations hereunder, can be mined at a profit on the market then prevailing, by the use of machinery and use of methods and management which, at the time, are modern, practical and efficient. It is understood and agreed between the parties hereto that said term "minable and merchantable" coal, as employed in this Lease, shall be given reasonable and practicable construction to the end that as much coal shall be recovered as reasonable and practicable, but without imposing any unreasonable burden upon the Lessee in this regard where unfavorable natural conditions are encountered.

### WEIGHTS

8.  As to the coal mined on the premises and transported and shipped by railroad cars, which is not commingled with coal mined from other premises, the quantity of coal upon which the Lessee shall pay royalty shall be determined by railroad weights; and, as to the coal mined from the premises and transported by other means of transportation, and as to coal sold locally, and coal used on the

premises (except that used in processing and preparing coal for market) the quantity of coal upon which the Lessee shall pay royalty shall be determined by standardized weigh scales to be provided by the Lessee, and according to the scale books and accounts of the Lessee, or according to any further rule or regulation which may be prescribed by the Lessor and accepted by the Lessee for the correct ascertainment and report of the quantity of such coal.

As to coal mined from the Leased Premises and which shall be commingled at the tipple or loaded with coal from other premises, payment of royalty shall be based on railroad weights, but shall be prorated according to the computed tonnage shown to have been mined from the Leased Premises and other premises, respectively, during said period or periods, such proration to be based on mine car weights, or on weightometers, if belt conveyors are used, and/or by engineers' measurements and computations which shall be made according to usual, customary, modern and accurate methods, or by any other scientifically reliable and accurate appliance or method.

## TAXES

9. The Lessee shall pay all taxes, levies, assessments and other charges imposed by the United States, the State of West Virginia, or any political subdivision thereof, or by any municipal corporation upon the entire estate of the Lessor in the lands included within the Leased Premises (except the oil and gas estate hereinafter mentioned) as well as upon the leasehold estate hereby created, and upon coal mined and produced therefrom so that the Lessor shall be entirely relieved from such charges. The Lessee shall also pay all taxes, levies, assessments and other charges, imposed by the United States, the State of West Virginia, or any political subdivision thereof, or by any municipal corporation, upon the Lessee, and upon all real estate, plant, equipment and improvements of the Lessee and upon the

mining or severance of the coal in the Leased Premises. If any payment on account of any or all of the above shall be made in the first instance by the Lessor, the same shall be repaid by the Lessee unto the Lessor upon statement and demand. It is not intended that the Lessee shall pay nor be required to pay any presently existing Business & Occupation Tax or corporation net income tax or Federal income tax assessed against Lessor, and it is not intended that Lessee shall pay any taxes attributable to the oil and gas estate.

## NONPAYMENT OF ROYALTY–FORFEITURE

10.  In the event of the failure or default on the part of the Lessee to make payments of rent, royalties and other moneys or taxes within the period of thirty (30) days next after the times herein fixed for such payments, the Lessor may give to the Lessee a written notice specifying in what respect the Lessee has defaulted in payment, and should Lessee fail to correct such default within thirty (30) days after receipt of such notice by certified mail, then at the election of Lessor, this Lease and the leasehold estate hereby created and all rights of the Lessee under this Lease shall become forfeited and cease and terminate and Lessor shall have the right without further notice, to reenter the Leased Premises and to take possession of all property thereon, to exclude the Lessee therefrom and to hold and possess and own said premises and property, including improvements and personal property placed thereon by Lessee, without any liability whatsoever for damages for so doing. In making any such reentry or taking possession of said premises or property, no service of a declaration sounding in ejectment, unlawful detainer or detinue upon the Lessee or upon the tenant in possession shall ne necessary; nor shall any notice or process provided by any statute of the State of West Virginia be necessary. Such reentry and retaking possession shall in no wise impair the right of Lessor to recover all unpaid payments provided for in this Lease, regardless of whether the same be matured or unmatured payments.

## RECORDS OF COAL MINED

11. Lessee shall keep accurate records of all coal produced from the Leased Premises and such records shall be subject at all reasonable times to the inspection of Lessor. Lessee shall keep said records in such manner as to segregate the tonnage of coal mined and removed from the Leased Premises separate and distinct from the tonnage of coal mined and removed from other portions of Lessee's mining operations.

Lessee shall furnish to Lessor on or before the 25th day of each calendar month during the term of this Amendment of Lease, a report showing the quantity of coal produced from the Leased Premises during the preceding calendar month. Such monthly reports shall, if required by Lessor, be accompanied by the railway company's certificate of weights, or the returns of the shipping department or sales agent of Lessee as to weights. Lessee hereby grants to Lessor, its engineer or agent, the right to obtain from any railroad on which coal mined hereunder shall be shipped, or from any barge line, or any person who weighs coal which Lessee may ship, manifests and other information as to quantity of coal mined hereunder and shipped over such railroad or by river, at such time or times as Lessor may desire such information; and this provision shall constitute full authority to such railroad, barge line or person to give such information to Lessor, its engineer or agent.

Lessee shall promptly upon termination of this Lease provide to Lessor copies of all reports and records made or received by Lessee relating to core drilling and other prospecting and exploration on the Leased Premises during the term hereof.

## OPERATION

12. Lessee further covenants that it will conduct any mining operation on the Leased Premises in a skillful, efficient and workmanlike manner, and in conformity with the present and future laws of the State of West

Virginia, the United States, and the valid regulations of the various agencies of both now in force or which may hereafter be adopted; employ machinery and methods that are modern, adequate and efficient; and develop the property on a sound and accepted engineering plan with due regard and according to an approved system of mining and with due regard to the future value of the Leased Premises as coal property. Before commencement of operations in any seam Lessee shall submit to Lessor a plan of operation in the seam showing in reasonable detail the method and system under which operations will be conducted in that seam. Lessor shall within thirty (30) days after the plan of mining has been submitted to it either approve or disapprove the plan and if no objections are made within said thirty (30) days, the plan shall be considered approved. If the Lessor shall object to the plan submitted by the Lessee, the engineers for the parties shall attempt to agree upon a satisfactory method and system of mining and if they fail to agree the question of a proper mining system within thirty (30) days after the objections by Lessor, the question of a proper plan shall be submitted to arbitration, as provided in Article 21 hereof, but the Lessee shall have the right to commence mining under its plan of operation and shall be liable to Lessor for any damages which may be found by the arbitrators to have been suffered by Lessor by reason of an improper plan of mining. After a plan has been settled by agreement or arbitration, the Lessee shall not depart therefrom without a modification established as the original plan was established and so long as Lessee shall mine according to such plan it shall not be liable for any injury to the surface or other strata owned by Lessor or for leaving unmined any coal which the plan shows will be left. It is recognized by the parties that the covenant contained in the preceding sentence and anything herein contained shall not impose any obligation on the part of the Lessee to proceed with diligence to operate any vein or seam of coal.

## SURVEYS AND MAPS

13.  The Lessee shall have a survey of the mine workings made by a competent mining engineer promptly as the work progresses, and shall keep an accurate and complete map of the Leased Premises and mine workings on an appropriate scale which shall be in conformity in all respects with the requirements of the bituminous mining laws of the State of West Virginia, and shall show all property lines, surface improvements and such natural topography as may require protection against liability for damages to persons or property. Such map shall at all times be accessible to the Lessor, its agents or representatives, for inspection; and a true, complete and correct copy of the same, in duplicate, shall be furnished to the lessor, without demand, within thirty (30) days after the first day of January and July of each year.

The Lessee shall also keep for each seam, an accurate and complete map of the Leased Premises and mine workings on a scale of four hundred (400) feet to the inch, or other appropriate scales showing in addition to the above-mentioned information, the projection of the mine development, and a true, complete and correct copy of the same shall be furnished to the Lessor, without demand, within thirty (30) days after the first day of January and July of each year. The aforesaid maps or copies thereof, together with the surveys, notebooks and calculations, as well as all engineering records and data, relative to the Leased Premises and mine workings, shall be delivered to and become the property of Lessor at the termination of this Lease or any renewal or extension thereof for any cause whatsoever.

## INSPECTION

14.  Lessor, its agents, engineers or other person in its behalf, with their assistants, shall have the right to enter at all reasonable times the said mines or works of the Lessee, in order to inspect, examine, select samples of

coal, survey or measure the seam or any part thereof, for the purpose of ascertaining the condition of the mines, the methods practiced, as well as the amount of coal removed, or for any other lawful purpose. Lessor shall give Lessee due notice of its intent to make inspections, and opportunity to have Lessee's agent or engineer accompany the representative of Lessor. Lessor alone shall be responsible for any injury to any agents, engineers or other persons in its behalf who may enter said mines or works of Lessee, unless such injury is caused by the negligence of Lessee.

## INDEMNITY

15. Lessee will indemnify and save harmless Lessor against and from any and all claims, regardless of when made, by and on behalf of any person, firm, corporation or governmental agency, arising from or growning out of Lessee's operations on or in or with respect to the Leased Premises; and, furthermore, in case any action or proceeding is brought against Lessor, by reason of any such claim, Lessee will resist and defend such action or proceeding and satisfy any order or judgment against Lessor resulting therefrom.

## ASSIGNMENTS

16. Lessee covenants that it and its successors and assigns shall not make any assignment of this Lease or any sublease of any of the surface of the Leased Premises without the prior written consent of the Lessor, but Lessor agrees that it will give its written consent to any assignment of this Lease to any subsidiary of Bethlehem Steel Corporation or to a company into which Lessee may be merged or which may be formed by any consolidation to which Lessee shall be party or to which substantially all of the assets of Lessee shall have been conveyed, *provided, nevertheless*, that Bethlehem Steel Corporation, such merged company, or any such consolidated company, as the case may be shall in each such case remain liable for or assume the obligations of the Lessee hereunder.

Any such written consent to assignment of this Lease to any subsidiary of Bethlehem Steel Corporation or to any such merged company or to any company or to any such consolidated company, as the case may be, shall be given by Lessor upon the express condition that no other or further assignment of said Lease shall hereafter be made without the written consent of the Lessor first had and obtained.

Lessor, by the execution of this Lease, consents to the sublease of buildings now existing on the Leased Premises with a reasonable amount of adjacent surface for business use or as dwellings, but this consent shall not authorize any further or other sublease.

### *INSOLVENCY, BANKRUPTCY, ETC.*

17. Lessee shall not permit this Amendment of Lease or the estate hereby created, or any interest therein, to be sold under any execution or other legal proceeding or process whatsoever. The assignment or transfer of this Amendment of Lease, or of the estate and rights created, or any of them, under judicial process or under judgment or decree or adjudication of Lessee as a bankrupt, or the discharge of Lessee by any court as an insolvent debtor, without the written consent of Lessor may, at the option of Lessor, be considered and held as an absolute forfeiture of this Amendment of Lease, and thereupon all the rights of Lessee hereunder shall at once cease and desist, and Lessor, in addition to all its other legal rights and remedies, may at its option, at once resume possession of the premises, either by legal process or by summary proceedings without legal process.

### *DEFAULT PROVISIONS*

18. If (i) Lessee shall fail or default in the payment of any sums required to be paid by it hereunder, when and as the same shall become due and payable and any such default shall continue for a period of thirty (30) days after written demand by Lessor for such payment; or (ii)

default shall be made by Lessee in the performance of any other covenant or condition herein contained to be performed by it and any such default shall continue for a period of sixty (60) days after written demand by Lessor for the performance thereof; or (iii) Lessee shall file a petition in bankruptcy, or make an assignment for the benefit of its creditors, or consent to the appointment of a receiver of itself or of the whole or any substantial part of its property, or shall be adjudicated a bankrupt, or an order, judgment or decree shall be entered by a court of competent jurisdiction, appointing, without the consent of Lessee, a receiver of Lessee or of the whole or any substantial part of its property, and such order, judgment or decree shall not be vacated or set aside or stayed within sixty (60) days from the date of such appointment, or any such stay shall be set aside, or Lessee shall file a petition under the provisions of Chapter X of the Bankruptcy Act or file an answer seeking the relief provided in said Chapter X, or a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Lessee under the provisions of said Chapter X, and such order, judgment or decree shall not be vacated, set aside or stayed within sixty (60) days from the date of entry thereof, or any such stay shall be set aside, or Lessee shall seek relief by petition, answer or otherwise under the provisions of any other now existing or future bankruptcy or other law providing for reorganization, dissolution, liquidation or winding up of corporations on the ground of insolvency, or any of the foregoing actions shall be taken by or with respect to any guarantor of any obligations of Lessee hereunder; then Lessor, at its option, may avail itself of all or any of the following remedies:

(a) declare a forfeiture of all the right, title and interest of Lessee to all the property forming the subject matter of this Lease;

(b) re-enter and take possession of the Leased Premises forming the subject matter of this Lease, including all improvements and personal

property theretofore placed by Lessee in or upon the Leased Premises, to the complete exclusion of Lessee;

(c) obtain in any court judgment in favor of Lessor and against Lessee for the amount of all indebtedness of Lessee to Lessor, including, but not limited to, all unpaid payments provided for in this Lease, regardless of whether the same be matured or unmatured payments.

## *REMEDIES*

19.  All rents, royalties and other payments hereinbefore provided to be paid to Lessor by Lessee shall be deemed, treated and considered as rent reserved under the contract for the demised premises and Lessor shall have for the collection thereof all rights and remedies which landlords may have for the collection of rent reserved upon contract under the present or any future laws of the State of West Virginia.

All of the remedies granted to Lessor herein shall be deemed to be cumulative and the exercise of any remedy shall not be considered as an election by Lessor of remedies or as a waiver of any other remedy specified in this article. Moreover, the specification of remedies in this article 19 shall not be deemed to exclude Lessor from any other legal or equitable remedy or remedies which it may have under the laws of the State of West Virginia. Failure on the part of Lessor to enforce any of the rights herein granted to it on default for any period or periods shall not operate as an estoppel or as a waiver against Lessor, or prevent it at any subsequent time from electing to exercise all or any of such rights for any subsequent default. In case any provision hereof shall be unenforceable or enforceable only to a limited extent, the inclusion herein of such provision shall not affect the validity of any other provision hereof, and any such provision which is enforceable only to a limited extent may be enforced to such extent with the same effect as if such provision had expressly provided in the alternative for the enforcement

thereof to the extent to which such provision may be enforceable.

## REMOVAL OF PROPERTY

20. When Lessee finally ceases to mine upon the Leased Premises, for a reason other than forfeiture of the Lease, Lessor shall have an option to buy any or all of Lessee's machinery, equipment and improvements then upon the Leased Premises, at its then fair market value. Such option must be exercised by Lessor, if at all, within one hundred twenty (120) days from the cessation of mining activities. If the parties are unable to agree on the fair market value of the machinery, equipment and improvements which Lessor elects to purchase, such value shall be determined by arbitration.

Upon the termination of this Lease, or renewals hereof, if any, Lessee shall have the right within a period of one (1) year thereafter to remove from the Leased Premises all of its machinery, equipment and improvements and other property, except that which Lessor has elected to purchase, provided Lessee has kept and performed its covenants hereunder.

## ARBITRATION

21. If at any time a difference of opinion or dispute shall arise between Lessor and Lessee with respect to any obligation arising under this Lease other than (a) the failure of Lessee to render an account of and pay royalties when due as hereinbefore provided, or (b) with respect to Lessor's rights under the provisions of paragraph 10 hereof, the question in dispute, if it cannot be settled between the parties, shall be referred to a Board of Arbitrators, consisting of three competent persons, one of whom shall be selected and paid by the Lessor, and one selected and paid by the Lessee, and the third chosen by the two thus selected and paid by Lessee and Lessor jointly; or in case of the inability of the arbitrators selected by the Lessor and Lessee to agree upon a third

the third shall be selected by any Judge of the District Court of the United States for the Southern District of West Virginia or a successor Federal court having jurisdiction over the area in which the Leased Premises lie. The party desiring such arbitration shall give written notice of the same to the other party, stating therein definitely the point or points in dispute, and name the person selected by such party as arbitrator; and it shall be the duty of the other party hereto within fifteen (15) days after receiving such notice to name an arbitrator and to designate any additional matters on which arbitration is requested and the two thus named shall select a third arbitrator. The arbitrators thus chosen shall, within five (5) days give to each of the parties hereto written notice of the time and place, when and where the hearing shall be had, which hearing shall begin not less than ten (10) nor more than thirty (30) days thereafter, and at the time and place appointed shall proceed with the hearing, unless for some good cause, of which the arbitrators or a majority of them shall be the judges, it shall be postponed until some later day or date, but within a reasonable time. Each of the parties hereto shall produce before the arbitrators any evidence or witnesses within its possession or control called for by any of said arbitrators. Both parties shall have full power to be heard upon any question submitted, and the determination of the Board of Arbitrators thus constituted, or a majority of the persons composing the same, shall be made in writing, and a copy delivered to each of the parties hereto, and shall be final and conclusive upon the parties in reference to the question or questions thus submitted. And the said arbitrators, or any two of them, may in their decision or award, as a part thereof, decide by whom the cost of such arbitration shall be borne and paid and the amount of such costs. No suit, action or proceeding at law shall be prosecuted or instituted until after a final award of the arbitrators and the award of the arbitrators may be entered as a decree or order by any court of competent jurisdiction.

## NOTICES

22. All requests, statements, notices and demands to Lessor under this Amendment of Lease shall be deemed to be sufficiently given and served for all purposes if sent by certified mail to Shonk Land Company, 905 Kanawha Banking & Trust Building, Charleston, West Virginia, 25301, or at such other address as Lessor from time to time by written notice to Lessee may prescribe.

All requests, statements, notices and demands to Lessee under this Amendment of Lease shall be deemed to be sufficiently given and served for all purposes if sent by certified mail to Bethlehem Mines Corporation, 119 Walnut Street, Johnstown, Pennsylvania, 15907, or at such other address as Lessee from time to time by written notice to Lessor may prescribe.

## SUCCESSORS AND ASSIGNS

23. This Amendment of Lease shall be binding upon and inure to the benefit of the parties hereto, and, subject to the provisions contained in Article 16 hereof, upon and to their respective successors and assigns.

IN WITNESS WHEREOF, said Shonk Land Company has caused this Amendment of Lease to be signed in its corporate name by its President or one of its Vice Presidents and its corporate seal to be hereunto affixed and attested by its Secretary and said Bethlehem Steel Cororation has caused this Amendment of Lease to be signed in its corporate name by its President or one of its Vice Presidents and its corporate seal to be hereunto affixed and attested by its Secretary or one of its Assistant Secretaries, all as of the day and year first above written.

SHONK LAND COMPANY

(CORPORATE SEAL)     By /s/ J. S. Stevens
                           President

ATTEST

/s/ W. Victor Ross
      Secretary

                                 BETHLEHEM STEEL
                                 CORPORATION

(CORPORATE SEAL)      By /s/ Francis Van Neys
                                  Vice President

ATTEST

/s/ G. L. Frankenfield
   Assistant Secretary

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to-wit:

I, Euna S. Malone, a notary public of said county, do certify that J. S. Stevens, who signed the writing hereto annexed, bearing date the 1st day of January, 1968, for SHONK LAND COMPANY, a corporation, has this day in my said county, before me, acknowledged the said writing to be the act and deed of said corporation.

Given under my hand this 2nd day of January, 1969.

My commission expires:

                              Euna S. Malone
                              Notary Public

[Seal]

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF Northampton, to wit:

I, Emily Louise McGuiney, a notary public of said county, do certify that Francis Van Neys, who signed the writing hereto annexed, bearing date the 1st day of January, 1968, for BETHLEHEM STEEL CORPORATION, has this day in my said county, before me, acknowledged the said writing to be the act and deed of said corporation.

352

APPENDIX B

Given under my hand and official seal this 16th day of December, 1968.

My commission expires: February 21, 1972

(NOTARY'S SEAL)                    Emily Louise McGuiney
                                   Notary Public

This instrument was prepared by Robert S. Spilman, Jr., Attorney at Law, Charleston, West Virginia.

## APPENDIX B

### "CONCLUSIONS OF LAW

"The Court, upon the foregoing Findings of Fact, makes the following Conclusion of Law:

"1. That the Amendment of Lease dated January 1, 1968, requires the Lessee–Plaintiff to pay to the Lessor–Defendant, royalties calculated on run of mine or raw tonnage of coal rather than on a processed or clean ton basis.

"2. That the failure of the Plaintiff to pay royalties, over the entire term of the Amendment of Lease, on the basis of raw tonnage constituted a material breach of the covenants and agreement therein.

"3. That the failure of the Plaintiff to pay to Defendant, during the term of the Lease, royalties at the surface mining rate on coal mined by surface mining methods constituted a material breach of the covenants and agreements of said Amendment of Lease.

"4. That the failure of the Plaintiff to furnish to Defendant mine maps showing the plan of operation of mining before commencement of mining on mines operated by Mynu Coals, Inc. and Fletcher Mining Company, during the term of the Lease, constituted a material breach of the covenants and agreements of said Amendment of Lease.

"5. That the failure of the Plaintiff to furnish to Defendant mine maps of Fletcher Mining Company and

Mynu Coals, Inc. showing the projection of mining within thirty (30) days after the 1st day of January and July of each year was a material violation of the covenants and agreements of said Amendment of Lease.

"6. That the failure of Fletcher Mining Company to conduct mining operations on the leased premises in a skillful, efficient, and workmanlike manner was a material violation of the covenants and agreement of the Amendment of Lease.

"7. That the violation of the laws, rules, and regulations of the State of West Virginia, by Fletcher Mining Company in mining on the leased premises was a material violation of the covenants and agreements of said Amendment of Lease.

"8. That Fletcher Mining Company and Mynu Coals, Inc. were contract miners on the leased premises, under the authority of the Plaintiff, and were not assignees or sublessees and that said contracts did not violate the covenants and agreements of said Amendment of Lease prohibiting assignments or subleasing of said leased premises.

"9. That the failure of Plaintiff to pay Defendant royalties on the 25th day of the month following production in December, did not constitute a material violation of the covenants and agreements of the Amendment of Lease.

"10. That by reason of the provisions of said Amendment of Lease, the Defendant has not waived any of the aforesaid breaches occurring during the term of the lease.

"11. That by reason of the material breaches of the covenants and agreements of the Amendment of Lease by the Plaintiff, the Plaintiff cannot avoid the Forfeiture of the Amendment of Lease as demanded by the Defendant in its letter of January 6, 1978.

354

"12. That by reason of said Forfeiture, the Plaintiff has forfeited its rights, titles and interests in the leased premises as of January 6, 1978, together with all of its improvements, machinery and personal property placed on said leased premises as of January 6, 1978.

"13. That the provisions of paragraph 4 of the Amendment of Lease, the right of the Plaintiff to renew the term of the Lease for an additional ten (10) year term, is contingent upon a 'condition precedent', that is, that the Plaintiff had to fully perform the covenants of the lease.

"14. That the Plaintiff has failed to perform the covenants of the Lease during the original term, as set forth herein, and therefore the plaintiff cannot prevent the refusal by Defendant to renew the term of said Lease as provided in Defendant's Notice of November 16, 1977, and letter of January 6, 1978.

/S/ Patrick Casey, Judge"