535 S.E.2d 713

BOARD OF EDUCATION OF the COUNTY OF KANAWHA, a Statutory Corporation, Petitioner Below, Appellee,

v.

QUINCY COAL COMPANY, a West Virginia Corporation, et al., Respondents Below, Appellees,

Charleston Hub, Inc., a West Virginia Corporation, Intervenor Below, Appellant.

No. 26604.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 2000.

Decided Jan. 28, 2000.

J. Nicholas Barth, Esq., Barth, Thompson & George, Charleston, West Virginia, Attorney for Board of Education.

Christopher J. Winton, Esq., Scott L. Summers, Esq., Payne, Loeb & Ray, Charleston, West Virginia, Attorneys for Quincy Coal Company.

Shannon M. Bland, Esq., Bland & Bland, Charleston, West Virginia, Attorney for Charleston Hub, Inc.

PER CURIAM:

This is an appeal by Charleston Hub, Inc. from the final Memorandum Opinion and Order of the Circuit Court of Kanawha County, entered October 30, 1998, in which the circuit

court held that Charleston Hub, Inc. was not a proper party to eminent domain proceedings instituted by the Board of Education of Kanawha County against Quincy Coal Company. The circuit court specifically found that Charleston Hub, Inc. does not hold, own, or possess any easement, right, or other interest in real estate which has been taken by the Kanawha County Board of Education in the eminent domain proceedings.

After careful consideration of the briefs, the arguments of the parties, and all matters of record, we conclude that the circuit court did not err in dismissing Charleston Hub, Inc. from the eminent domain proceedings. Accordingly, we affirm the circuit court.

## I.

### PROCEDURAL HISTORY

On July 22, 1996, the Kanawha County Board of Education ("Board of Education"), appellee herein, filed a condemnation action against Quincy Coal Company ("Quincy Coal"), a West Virginia corporation, appellee herein, and others, to acquire property on which to build a new high school.[1] This property is located in the Cabin Creek District of Kanawha County and consists of three parcels amounting to 42.907 acres.[2] Hearings on the issue of just compensation and damages for the condemned property were held before a panel of condemnation commissioners pursuant to W.Va.Code § 54–2–7b (1963).

Subsequent to the commencement of these hearings, Charleston Hub, Inc. ("Charleston Hub"), a West Virginia corporation and appellant herein, moved, pursuant to Rule 24(a) of the West Virginia Rules of Civil Procedure, to intervene as a matter of right in the condemnation proceedings. In its motion to intervene, Charleston Hub stated that it is the fee simple owner of certain mineral and coal interests located along the Kanawha River and Witcher Creek in Kanawha County. It also claimed, as an easement appurtenant to these mineral and land interests, a

right of way over and across the property which was the subject of the condemnation proceedings. According to Charleston Hub, this right of way was created by deed dated July 2, 1883 between John S. Cole, Special Commissioner, and others.

By order of March 28, 1997, Charleston Hub's motion to intervene was granted. Upon the motion of Quincy Coal, the circuit court entered an order bifurcating the trial of the validity and extent of the easement claimed by Charleston Hub from the trial of the value of the property taken in the eminent domain proceedings. A bench trial to determine the validity and extent of the easement claimed by Charleston Hub was held on September 15, 16, and 17, 1997 in the Circuit Court of Kanawha County.

To prove its case that the claimed easement existed on the condemned property, Charleston Hub presented the testimony of William C. Stucky who allegedly owned the claimed easement before conveying it to Charleston Hub by quitclaim deed; and C. Page Hamrick, III, the lawyer who examined Charleston Hub's title to the claimed easement as well as two other parcels of land surrounding the condemned property on which the right of way allegedly was located. As rebuttal evidence, Charleston Hub presented the testimony of Sam Diehl, a registered civil engineer and petroleum engineer. The Board of Education and Quincy Coal presented the testimony of Randy Crace, a licensed professional surveyor; Donald C. Pauley, the Vice President of Quincy Coal; and Robert Howell who performed the title examination of the condemned property on behalf of the Board of Education.

On October 30, 1998, the circuit court entered a 50–page Memorandum Opinion and Order ("final order") in which it made extensive findings of fact and conclusions of law. The circuit court found, *inter alia*, that Charleston Hub did not prove by clear and convincing evidence that it owns an easement which was taken by the Board of Education in the eminent domain proceedings and, ac-

---

1. Construction of this new high school is now completed. The new school is known as Riverside High School.

2. Parcel 1 consisted of 40.588 acres; Parcel 2 consisted of 0.991 acre; and Parcel 3 consisted of 1.328 acres.

cordingly, dismissed the claims of Charleston Hub.

## II.

## FACTS

In order to understand the issues in this case, it is necessary to briefly review the evidence adduced at trial through testimony and exhibits and incorporated into the findings of the circuit court in its final order.

The complex facts of this case stretch back into the nineteenth century to the early years of West Virginia's statehood and include the names of some of Kanawha County's prominent families. William Dickinson, the elder, and Joel Shrewsbury were partners who owned a large tract of land located in eastern Kanawha County, north of the Kanawha River, on the waters of Simmons Creek, Witcher Creek, Carroll Branch and several smaller tributaries of the Kanawha River. Subsequent to the deaths of Dickinson and Shrewsbury, a partition of their property was effected. Specifically, a parcel of land consisting of 5,866 acres was conveyed to the heirs and devisees of William Dickinson by a partition deed dated January 1, 1873. This partition deed provided, in part:

> [T]his deed is made with the express stipulation that all Necessary and convenient rights of way for waggon Roads and Railroads surface or subterranean all necessary and convenient use of Witchers Creek & any and all of its branches, for the transportation of floating of timber, or other products, shall attach and pertain to every tract of land, herein conveyed, through, upon, over, & under every other tract of land also herein conveyed, which rights of way and other privileges shall attach to the full extent of all needs in the mining and transportation of coal, & other minerals, timber and other products, from & to each tract-respectively and to the full extend [sic] of affording to each owner

every facility in this behalf needful, to secure to each owner the full use & benefit of his land, and its products, provided however, that in the location of such Roads, & exercise of such privilege a due regard shall be exercised for the rights & convenience, of the parties whose lands are affected by such location[.][3]

By deed of April 24, 1874, the heirs and devisees of William Dickinson further partitioned the 5,866 acres among themselves, and the son of William Dickinson, William Dickinson the younger, received a one-half interest in the land. By deed dated February 22, 1876, William Dickinson the younger conveyed to his son, John Quincy Dickinson, a parcel of land consisting of 331 acres, three rods, and one pole. John Q. Dickinson resided on this parcel of land. Upon the death of William Dickinson the younger in 1881, he devised to John Q. Dickinson a parcel of land on the Kanawha River adjacent to the land conveyed to John Q. Dickinson in 1876. This land is described as follows:

> that part of my land lying adjoining to and below the land on which [John Q. Dickinson] now resides.... Beginning on the Kanawha River at my upper which is his lower corner, nearly opposite my Houston land and running thence with our common line acrop the bottom with the Osage Hedge to the old state Turnpike road; thence down said road to the corner of the house lot where John Slack lives; thence to the left, around said lot, to the fence running from Slack's big gate to the branch near the hickory spring and continuing the same course some forty yards further and turning to the right and down the ridge and along a cartway and hedge to an Osage Hedge and turning to the left, and with said hedge to the Kanawha River nearly opposite T.N. Conihays, thence up the Kanawha River to the beginning[.]

At issue in this case is the express right to tie boats on the above-described land:[4]

---

3. Excerpts of early deeds and wills appearing in this opinion are taken from the briefs and exhibits by counsel. Although copies of these early deeds and wills are included in the exhibits, they are handwritten and very difficult to read.

4. At oral argument, the question arose whether Charleston Hub's claimed ownership interest in the condemned property is based on both the surface rights of way created in the January 1, 1873 partition deed and the right to tie boats created in the 1881 will or only on the right to tie boats. Counsel for Charleston Hub argued that

reserving, nevertheless, the right of tying boats, and other water craft on and along said river bank of the land hereby given for any other devisees; if they should need the use of the same at any time hereafter for that purpose in connection with the shipment of coal or anything else from the lands hereinafter given to them or to their use.

The property devised in this will, not including the specific property devised to John Q. Dickinson, was partitioned by William Dickinson's other devisees by deed dated July 2, 1883. Lots one through six went to Mary Winkler; lots seven through ten went to Sally J. Dickinson; and lots 11, 12, 13, 14 and 16 were held in trust for the Cobb heirs. The right to tie boats at issue became known as "Lot 15"[5] in the partition deed and was conveyed to William Laidley, in trust for the Cobb heirs, Mary, Sally and Mattie. Lot 15 is described in the partition deed as follows:

Lot No. 15 herein granted is the right named in the will, of tying boats and water crafts along the bank of the Kanawha River, in front of the tract of land named in the devisee [sic] of Wm. Dickinson to John Q. Dickinson named in the will, and extends from the upper end of McFarlane's river bank lease up to the old line between Wm. Dickinson and John Q. Dickinson.

By deed dated May 31, 1917, John Q. Dickinson and his wife conveyed to Quincy Coal a tract of land consisting of approximately 1162.34 acres. The circuit court found that this tract included the tract devised by William Dickinson to John Q. Dickinson in 1881, and this finding is not challenged.

The appellant, Charleston Hub, bases its ownership of the right to tie boats upon two deeds. The first is a February 11, 1992 deed of 200 acres from Thomas H. Gilpin to Charleston Hub which is recorded. The second is a September 30, 1992 deed for all the coal, other minerals and mineral substances underlying a tract of land containing 645 acres from William C. Stucky to Charleston Hub. This deed was not recorded until July 10, 1997, almost one year after the condemnation action was filed and entry by the Board of Education upon the condemned land pursuant to order.[6] The property conveyed in this deed is described to include "all surface rights, easements, and appurtenances thereunto belonging to the property described . . . as 'Lot No. 15[.]' "

Charleston Hub claims that the 200–acre parcel of land and the 645–acre parcel of land were originally devised by William Dickinson the younger in his 1881 will. Therefore, because the right to tie boats was created for the benefit of the remaining tracts of land devised in the will, the right to tie boats is an easement appurtenant to the 200 acres and 645 acres now owned by Charleston Hub. Said another way, Charleston Hub alleges that the property condemned by the Board of Education is the servient estate of the right to tie boats, and the 200–acre and 645–acre parcels of land are the dominant estates of this right. Charleston Hub also points to the fact that the September 30, 1992 quitclaim deed explicitly conveys to it the right to tie boats. Finally, Charleston Hub asserts that the property devised to John Q. Dickinson in the 1881 will is the same property owned by Quincy Coal and condemned by the Board of Education.

Charleston Hub's claim is based on both. Counsel for the Board of Education and Quincy Coal, on the other hand, asserted that the only issue below concerned the location and continued existence of the right to tie boats. After reviewing the trial transcripts, briefs, and final order of the circuit court, we conclude that the primary issue below and before this Court is the location and continued existence of the right to tie boats created in the 1881 will.

5. During oral argument, the question arose whether the right of way in question in this case is a right to tie boats or is an actual parcel of

land. The parties agreed that the easement claimed herein consists of the right to tie boats and is not a parcel of land. Likewise, the circuit court found that the right to tie boats was not an estate in land that was required to be listed separately on the land books.

6. The circuit court found that failure to record the quitclaim deed was "a superfluous act" because the right to tie boats was not conveyed by deed. Instead, the right to tie boats followed the conveyance of the dominant estate as an easement appurtenant.

In its final order, the circuit court held that the 200–acre tract of land does not benefit from the easement for the purpose of tying boats; the 645–acre tract does benefit from the easement for the purpose of tying boats but that Charleston Hub failed to prove good title to the 645–acre tract; the right to tie boats has been extinguished by operation of the doctrine of estoppel; and Charleston Hub failed to prove by clear and convincing evidence that the property devised to John Q. Dickinson in the 1881 will includes the 43–acre tract condemned by the Board of Education. Because we decide this case on the issue of the location of the claimed easement, we need not address the circuit court's other findings.

## III.

### STANDARD OF REVIEW

■ This Court will not set aside the circuit court's findings of fact unless we find them to be clearly wrong. We have stated that "[a] trial court's findings of fact will be affirmed unless plainly wrong or against the clear preponderance of the evidence." Syllabus Point 1, *Bethlehem Steel Corp. v. Shonk Land Co.*, 169 W.Va. 310, 288 S.E.2d 139 (1982). *See also*, Syllabus Point 7, *Bluefield Supply Company v. Frankel's Appliances, Inc.*, 149 W.Va. 622, 142 S.E.2d 898 (1965) ("The finding of a trial court upon the facts submitted to it in lieu of a jury will be given the same weight as the verdict of a jury and will not be disturbed by an appellate court unless the evidence plainly and decidedly preponderates against such finding"). The circuit court's conclusions of law, on the other hand, are reviewed de novo. Syllabus Point 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996).

## IV.

### DISCUSSION

■ It is well-settled that "[t]he burden of proving an easement rests on the party claiming such right and must be established by clear and convincing proof." Syllabus

Point 1, *Berkeley Development Corp. v. Hutzler*, 159 W.Va. 844, 229 S.E.2d 732 (1976). The circuit court found that Charleston Hub failed to prove by clear and convincing evidence that the easement for the purpose of tying boats (Lot 15) is located on the property condemned by the Board of Education.

In attempting to show the location of the property subject to the right to tie boats, Charleston Hub relied heavily on an 1883 map which depicts the partition of the residuary lands by the residuary beneficiaries under William Dickinson's 1881 will. The 1883 map shows the land devised by the 1881 will to John Q. Dickinson as an irregular tract of land which bears no designation. Lot 15 or the right to tie boats is shown as located on the riverbank of John Q. Dickinson's tract. The map also shows Winkler Lots numbers two, three, and 13 to the west of the John Q. Dickinson tract with lot numbers three and 13 adjoining the John Q. Dickinson lot.[7] Charleston Hub's evidence was that Winkler Lots two and three located to the immediate west of the John Q. Dickinson tract can be located today and that by measuring the distances as shown in the deeds, the western boundary of the property subject to the easement for the purpose of tying boats can be located. Charleston Hub also presented evidence that the eastern boundary of the property subject to the easement for the purpose of tying boats was the western boundary of the 331–acre parcel conveyed by William Dickinson to John Q. Dickinson in 1876. The 1876 deed to the 331–acre parcel contains a reference to Carroll Branch which, according to Charleston Hub's evidence, can be located today.

In finding that Charleston Hub failed to prove by clear and convincing evidence that the right to tie boats is located on the condemned property, the circuit court reasoned as follows:

Charleston Hub, Inc. contends that it can locate Winkler Lots Nos. 2 & 3 today. These lots were the two westernmost parcels making up the property owned by

---

**7.** The circuit court found that this map accurately portrays the location of the easement for the purpose of tying boats.

Quincy Coal Company prior to the conveyances to Hemmings, the Kanawha County Board of Education (for Midland Trail Elementary School) and the Toledo and Ohio Central Railroad Company, made from the western portion of its property. In other words, the westerly boundaries of the Hemmings, Midland Trail Elementary School and Toledo and Ohio Central Railroad Company tracts are the same as the westerly boundaries of Winklers Lots Nos. 2 & 3. Therefore, Charleston Hub, Inc. could take a map of the property as it exists today, and use the western boundaries of the property conveyed to Hemmings, the Kanawha County Board of Education and the Toledo and Ohio Central Railroad Company as the western boundaries of Winkler Lots Nos. 2 & 3. It could then plat out Winkler Lots Nos. 2 & 3 and the property subject to the right to tie boats. A map of Lots Nos. 2 & 3 and the property subject to the right to tie boats overlaid over a map of the property as it exists today would show the location of the property devised subject to the right to tie boats in relation to the property as its [sic] exists today, including the property being condemned. This would disclose whether or not the property subject to the right to tie boats is located, in whole or in part, on the property being condemned. Charleston Hub, Inc. could have used other engineering or surveying evidence to prove the relative locations of the condemned property and the property subject to the right to tie boats.

However, the evidence presented at trial, consisting primarily of the testimony of Mr. [Diehl], did not clearly and convincingly prove the relative locations of the property subject to the right to tie boats and the condemned property. The evidence presented has not left the Court with the "firm belief or conviction" that the property subject to the right to tie boats is located on the condemned property. Based upon the evidence in the record, Charleston Hub, Inc. has failed to satisfy its burden of proving the location of the property by clear and convincing evidence.

In its brief and argument before this Court, Charleston Hub contends that the many deeds, maps, and plats produced in evidence proved that the easement for the purpose of tying boats created in the 1881 will of William Dickinson is located on the property condemned by the Board of Education. In support of this contention, the appellant summarizes the contents of several deeds or leases to show that by comparing the numerous calls stated in the several documents, one must conclude that the property devised to John Q. Wilkinson on which the right to tie boats is located is the same property condemned by the Board of Education.

After considering the evidence produced by Charleston Hub at trial, this Court is unable to conclude that the evidence plainly and decidedly preponderates against the circuit court's finding. As noted by the circuit court in its lengthy, detailed, and well-reasoned final order, the description of the land devised to John Q. Dickinson in 1881, on which the right to tie boats was located, consisted solely of natural and dependent monuments. The description does not contain any directional lines and distances. Charleston Hub failed to adduce any evidence at trial that connected any of the monuments referenced in the 1881 description of the John Q. Dickinson land to the property condemned by the Board of Education. Charleston Hub also failed to produce evidence describing the claimed easement for the purpose of tying boats by reference to any monuments presently located on the condemned property. In addition, Charleston Hub failed to present evidence showing that boats had ever been tied on the condemned property. Finally, Charleston Hub did not present evidence of a licensed surveyor to show the present location of the right to tie boats. In the absence of such proof, we cannot conclude that the circuit court erred in finding that Charleston Hub failed to prove by clear and convincing evidence that the easement for the purpose of tying boats is located on the property condemned by the Board of Education.

**V.**

**CONCLUSION**

For the reasons set forth above, we conclude that the circuit court's finding that

Charleston Hub, Inc. does not hold, own, or possess any easement, right, or other interest in the real estate taken by the Kanawha County Board of Education in the underlying eminent domain proceedings is not plainly wrong.[8]  Accordingly, we affirm the circuit court's ruling that Charleston Hub is not a proper party to the condemnation proceedings instituted by the Kanawha County Board of Education against Quincy Coal Company and dismissing Charleston Hub, Inc. from those proceedings.[9]

Affirmed.

Justice McGRAW dissents.

Chief Justice MAYNARD, deeming himself disqualified, did not participate in the Opinion of the Court.

**8.**  We emphasize that it is not our holding that the easement for the purpose of tying boats created in the 1881 will of John Q. Dickinson does not still exist or that Charleston Hub does not own the easement.  Rather, our limited holding is that Charleston Hub failed to prove by clear and convincing evidence that the easement is located on the 43–acre tract of land condemned by the Board of Education.

**9.**  In its brief to this Court, Charleston Hub, Inc. also assigned as error the circuit court's finding that the right to tie boats was extinguished by the doctrine of estoppel, and its finding that Charleston Hub, Inc. failed to show good title to the 645–acre tract. The Kanawha County Board of Education and Quincy Coal Company cross-assigned as error the circuit court's finding that the right to tie boats was an easement appurtenant and not an easement in gross.  In addition, Quincy Coal Company cross-assigned as error the circuit court's finding that the right to tie boats was not extinguished by abandonment, prescription, and cessation of purpose, from the undisputed evidence that neither the surface easement nor the mooring easement was used at any time during the preceding period of 117 years.  We do not find it necessary to address these issues.